# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | § | Case No. 20-30336 (DRJ) |
|  | § |  |
| Reorganized Debtors. | § | (Jointly Administered) |
|  | § |  |
| MICHAEL VAN DEELEN | § |  |
|  | § |  |
| Plaintiff, | § | Adv. Proc. No. 20-___ |
|  | § |  |
| v. | § |  |
|  | § |  |
| DAVID DICKSON, | § |  |
| and STUART SPENCE, | § |  |
| and SCOTT LAMB, | § |  |
| and 10 JOHN/JANE DOES | § |  |
|  | § |  |
| Defendants. | § |  |
|  | § |  |

## NOTICE OF REMOVAL

TO THE U.S. BANKRUPTCY CLERK:

Please take notice that pursuant to 28 U.S.C. § 1452(a), Federal Rule of Bankruptcy Procedure 9027 and Local Rule 9027-1, Defendants David Dickson ("***Dickson***"), Stuart Spence ("***Spence***"), and Scott Lamb ("***Lamb***") (collectively "***Defendants***") hereby remove the above-captioned civil action, and all claims and causes of action therein, from the 284th Judicial District Court of Montgomery County, Texas, to the United States Bankruptcy Court for the Southern District of Texas (the "Court").

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

## I.     JURISDICTION AND BASIS FOR REMOVAL

1.     Three months after the Court issued its Confirmation Order confirming McDermott International, Inc.'s plan of reorganization, on June 23, 2020 (D.I. 651) Michael Van Deelen ("***Van Deelen***"), filed suit against Defendants in Texas state court alleging conversion, common and statutory fraud, negligent misrepresentation, breach of fiduciary duty, and conspiracy (the "***State Court Lawsuit***").[2]

2.     Removal of the State Court Lawsuit is proper under 28 U.S.C. § 1452(a) because the claims being removed are pending in "a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power," and this Court has subject matter jurisdiction under 28 U.S.C. § 1334.

3.     Federal subject matter jurisdiction exists under 28 U.S.C. § 1334 because the State Court Lawsuit is "related to" the Debtors' bankruptcy proceeding. The entry of a final judgment against Defendants would directly and substantially affect the Debtors, their operations, and/or the implementation or execution of the Plan.  Moreover, adjudication of the claims requires interpretation and enforcement of this Court's Confirmation Order, which releases and exculpates Defendants from certain claims that have been brought.

4.     Likewise, federal subject matter jurisdiction also exists under 28 U.S.C. § 1334 because the State Court Lawsuit "arises in" the Debtors' bankruptcy proceedings and

---

[2] The State Court Lawsuit is Cause No. 20-06-07348 in the 284th Judicial Court of the State of Texas, Montgomery County, styled *Michael Van Deelen v. David Dickson, and Stuart Spence, and Scott Lamb, and 10 John/Jane Does.*

adjudication of the claims would require interpretation and enforcement of this Court's Confirmation Order, including the release and exculpation provisions.[3]

5.      Venue is proper in the Southern District of Texas under 28 U.S.C. § 1452(a) because the Texas state court where the State Court Lawsuit is pending is located in this district.

## II.      THE PARTIES

6.      Pursuant to Local Rule 9027-1(a), the following is a list of the names and addresses of all parties to the State Court Lawsuit, and the name, address, and telephone number of counsel of record for each party.

7.      Plaintiff Michael Van Deelen is a *pro se* party in the State Court Lawsuit, and his current contact information is:

Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

8.      Defendants David Dickson, Stuart Spence, and Scott Lamb are represented by:

Matthew D. Cavenaugh, mcavenaugh@jw.com
Jennifer F. Wertz, jwertz@jw.com
Kristhy M. Peguero, kpeguero@jw.com
Veronica A. Polnick, vpolnick@jw.com

Jackson Walker L.L.P.
1401 McKinney Street, Suite 1900
Houston, TX 77010

Anna G. Rotman, anna.rotman@kirkland.com
Jamie Alan Aycock, jamie.aycock@kirkland.com
John Christian, john.christian@kirkland.com

---

[3] *See, e.g.*, *In re ABC Dentistry, P.A.*, No. H-19-0682, 2019 WL 6894775, *4-7 (S.D. Tex. Dec. 17, 2019) ("[Bankruptcy] jurisdiction extends to matters that impact compliance with or completion of the reorganization plan. A bankruptcy court plainly has jurisdiction to interpret and enforce its own prior orders.") (internal citations and quotation marks omitted).

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
609 Main Street
Houston, TX 77002

## III.   COMPLIANCE WITH RULE 9027

13.     Bankruptcy Rule 9027(a)(1) requires that this Notice of Removal "contain a statement that upon removal of the claim or cause of action the party filing the notice does or does not consent to the entry of final orders or judgment by the bankruptcy court." Defendants respectfully state that they consent to the entry of final orders or judgments by the Bankruptcy Court.

9.     Local Rule 9027-1(b) further requires that this Notice of Removal "be accompanied by copies of all papers that have been filed in the court from which the case is removed." Attached are copies of all such papers.

DATED:  July 17, 2020                                    Respectfully submitted,
Houston, Texas


/s/ Matthew D. Cavenaugh
**JACKSON WALKER L.L.P.**                               **KIRKLAND & ELLIS LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)              **KIRKLAND & ELLIS INTERNATIONAL LLP**
Jennifer F. Wertz (TX Bar No. 24072822)                 Anna G. Rotman, P.C. (TX Bar No. 24046761)
Kristhy M. Peguero (TX Bar No. 24102776)                Jamie Alan Aycock (TX Bar No. 24050241)
Veronica A. Polnick (TX Bar No. 24079148)               John Christian (TX Bar No. 24109727)
1401 McKinney Street, Suite 1900                        609 Main Street
Houston, TX 77010                                       Houston, TX 77002
Telephone:  (713) 752-4200                              Telephone:  (713) 836-3600
Facsimile:  (713) 752-4221                              Facsimile:  (713) 836-3601
Email:       mcavenaugh@jw.com                          Email:       anna.rotman@kirkland.com
             jwertz@jw.com                                           jamie.aycock@kirkland.com
             kpeguero@jw.com                                         john.christian@kirkland.com
             vpolnick@jw.com

*Co-Counsel to Defendants*                              *Co-Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 17, 2020, a true and correct copy of the foregoing Notice of Removal was served via the Court's ECF notification system to the parties listed below at the email addresses listed.

Michael Van Deelen, *Pro Se*
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com


*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

# Document 1

Received and E-Filed for Record
6/23/2020 9:44 AM
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Kayla Adams

**CAUSE NO.** 20-06-07348

| | | |
|---|---|---|
| MICHAEL VAN DEELEN | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | **Montgomery County - 284th Judicial District Court** |
| | § | |
| v. | § | OF MONTGOMERY COUNTY, |
| | § | TEXAS |
| DAVID DICKSON, | § | |
| and STUART SPENCE, | § | |
| and SCOTT LAMB, | § | _____ JUDICIAL DISTRICT |
| and 10 JOHN/JANE DOES | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL PETITION

COMES NOW Michael Van Deelen, plaintiff in the above-styled cause of action, and for his cause of action shows as follows:

### DISCOVERY CONTROL PLAN

1.  Plaintiff intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure 190.3.

### PARTIES

2.  Defendant Scott Lamb is an individual residing in Montgomery County, Texas, who can be served at his residence: 29 Watermill Ct, The Woodlands, Tx, 77380.  At all times material herein, defendant Lamb was McDermott International's Vice President of Investor Relations.

Unofficial Copy

3.  Defendant David Dickson is an individual believed to be residing in either Montgomery County, Texas, or Harris County, Texas, who can be served at McDermott International, 757 N. Eldridge Pkwy, Houston, Tx, 77079.  At all times material herein, defendant Dickson was the President and Chief Executive Officer of McDermott International.

4.  Defendant Stuart Spence is an individual residing in Harris County, Texas, who can be served at his residence: 301 Hedwig Street, Houston, Tx, 77024.  At all times material herein, until 11/4/2019, defendant Spence was the Executive Vice President and Chief Financial Officer of McDermott International.

5.  The 10 John/Jane Doe defendants, if any, will be identified through the process of discovery.

## JURISDICTION AND VENUE

6.  This Court has personal jurisdiction over the defendants because they (a) have, at all material times, conducted business in Texas; (b) have committed tortuous actions, in whole or in part, in Texas; and (c) have sufficient minimum contact with Texas such that the assumption of jurisdiction will not offend traditional notions of fair play and substantial justice.

7.  Plaintiff seeks monetary relief of $180,000.00, plus exemplary damages, and the damages sought are therefore within the jurisdictional limit of this Court.

Unofficial Copy

8.  Venue is proper in Montgomery County, Texas, pursuant to Section 15.002(a)(2) of the TEX. CIV. PRAC. & REM. CODE because it was the residence of one or more of the defendants at the time plaintiff's causes of action accrued.

## FACTUAL ALLEGATIONS

**Defendants Dickson and Spence Have a History of Being Accused of Making Material Misrepresentations and Omissions in Their Communications to McDermott Shareholders.**

9.  The following is alleged on information and belief.

10.  On November 15, 2018, a complaint was filed in the United States District Court for the Southern District of Texas seeking class action status on behalf of purchasers of McDermott International ("McDermott") common stock and alleging damages on their behalf arising from McDermott's allegedly false and misleading statements during the class period from January 24, 2018, to October 30, 2018.  The case is captioned *Edwards v. McDermott International, Inc., et al,* No. 4:18-cv-04330.  The defendants in the case are McDermott; David Dickson, McDermott's President and CEO; and Stuart Spence, McDermott's Chief Financial Officer (who left McDermott on 11/4/2019).  The plaintiff in that case has alleged that the defendants made material misrepresentations and omissions about the integration of the CB&I (Chicago Bridge and Iron) business, certain CB&I projects and their fair values, and McDermott's business, prospects and operations.

Unofficial Copy

11.  On January 14, 2019, a related action was filed in the United States District Court for the Southern District of Texas seeking class action status on behalf of all shareholders of McDermott common stock as of April 4, 2018, who had the right to vote on the McDermott/CB&I Combination, captioned: *The Public Employees Retirement System of Mississippi v. McDermott International, Inc., et al,* No.4:19-cv-00135.  The plaintiff in that case has alleged the defendants, which include Mr. Dickson and Mr. Spence, made material misrepresentations and omissions in the proxy statement McDermott used in connection with the Combination. The court granted McDermott's motion to consolidate the two actions on February 22, 2019.  The case is ongoing.

12.  On July 26, 2019, the Securities and Exchange Commission ('SEC') sent a letter, accompanied by subpoenas, notifying McDermott International that it is under investigation for failing to properly disclose projected losses on its Cameron LNG (Hackberry) project (which was part of CB&I when McDermott acquired that company).  Furthermore, McDermott failed to disclose the SEC investigation to any of its lenders before they had agreed to provide $1.7 billion of additional financing to the company on or about October 21, 2019, as discussed below.

Unofficial Copy

**Timeline of Events**

13.   The following is alleged on information and belief.

14.   On March 22, 2019, 2019 Proxy materials were sent to McDermott shareholders.  The materials contained a letter from Mr. Gary Luquette, McDermott's Independent Chairman of the Board.  The letter, which was reviewed and approved by the defendants herein prior to being published, contained glowing statements concerning McDermott's outlook.  For example:

"Today, we are a fundamentally different and much larger company, as compared to where we were at the end of 2017, with a formidable new presence in significant onshore markets."

"Thanks to the tremendous amount of hard work and dedication of our Board, executive management and employees during 2018, we are ahead of schedule in becoming a premier, fully integrated, global engineering, procurement, construction and installation ("EPCI") provider, with product solutions spanning onshore and offshore from concept to commissioning."

"Looking forward to 2019, our end markets are growing.  We are continuing to see recovery in the offshore and subsea, LNG and downstream markets, with the highest McDermott revenue opportunity pipeline in our history.  Today, McDermott is well-positioned to offer the technology-led, vertically-integrated solutions that we know our customers are seeking.  We believe that McDermott

Unofficial Copy

has the right strategy in place to play a major role in the next chapter of global energy solutions."

15.  At the time the letter was published, the defendants were aware that McDermott's Cameron LNG (liquefied natural gas) project had estimated probable losses of over $1 billion (approximately $3.50 per share) that would need to be recognized in the coming quarters.

16.  Nowhere did the proxy materials warn of any impending danger to the outlook for McDermott.  However, even though McDermott management was being exceedingly well compensated (e.g.- defendant Dixon's total remuneration in 2018 exceeded $11 million, most of which came from stock awards, and defendant Spence's total 2018 remuneration was $3.6 million, most of which also came from stock awards), the Board recommended a substantial increase in the company's Long-Term Incentive Plan which would further enrich company insiders through stock grants.

17.  On April 29, 2019, barely a month after Chairman Luquette's March 22, 2019, letter and  just days before McDermott's May 2, 2019, annual shareholder meeting, the company released its first quarter 2019 report.  The report, reviewed and approved by the defendants before being published, was effusive in its praise for the results the company had achieved and provided no commentary or evidence that anything was amiss at McDermott.  In part, the report stated:

Unofficial Copy

18.  "More broadly, the company continues to exhibit commercial success in a steadily improving market.  In particular, McDermott reported a book-to-bill ratio of 3.0x, a new award total of $6.7 billion and a 41% sequential-quarter improvement in backlog."

19.  In the report, management released its full-year 2019 earnings guidance, which predicted strong second-half 2019 results.  The guidance predicted that McDermott's full year earnings per share would be $.90

20.  Nowhere in the first quarter report or the full-year guidance were shareholders informed of the significant losses being accrued by the company's Cameron LNG project.  These losses were not included in the first quarter results or in the full-year projections.

21.  McDermott held its annual shareholders meeting on May 2, 2019.  All reports, slides and presentations given to shareholders at the meeting were reviewed and approved in advance of the meeting by the defendants.  The meeting continued the good-news reporting that had taken place in prior months.  For example, the company showed a slide to shareholders which stated:

"Post-Combination, McDermott is a fundamentally different and much larger company as compared to where we were in 2017, with significant earnings potential."

Unofficial Copy

22.  The slide showed dramatic increase in revenues, backlog and order intake from the prior year.

23.  At no time during the meeting were the company's shareholders informed of the significant losses being accrued by the company's Cameron LNG project.  These losses were not discussed during the meeting by the defendants or in any report, slide or presentation given during the meeting.

24.  **During the meeting, the shareholders approved the Board-recommended change to the company's long-term incentive plan which significantly increased the potential remuneration of the defendants and other company insiders.**

25.  In July, 2019, just weeks after the May 2, 2019, annual shareholder meeting in which McDermott shareholders approved a substantial increase in the company's long-term incentive plan, McDermott management undertook a study (the "Financing Case") the purpose of which was to consider a change in the capital structure of the company.  This study, though material, was not disclosed to shareholders or the SEC.

26.  The "Financing Case" was undertaken because the company, with the prior knowledge and at the direction of  the defendants, was about to start reporting the huge losses that had been accruing on the Cameron LNG project.  Reporting said losses would significantly impair the company's cash flow and would threaten

Unofficial Copy

the company's loan covenants.  The company therefore decided to look for sources of capital to "finance" increases in working capital and serve as a buffer to its loan covenants.

27.  The undertaking of the "Financing Case" and the reasons for it were highly material but, with the prior knowledge and at the direction of the defendants, no public announcement was made and company's shareholders were left in the dark about the Financing Case and very serious earnings, cash flow and loan covenant issues the company faced.

28.  On July 29, 2019, McDermott released its second quarter 2019 results which unexpectedly showed the company lost $146 million during second quarter 2019 versus a net income of $47 million during the prior year period.  In addition, the company, with the prior knowledge and at the direction of the defendants, reduced its full year guidance which now predicted the company would **lose** $1.65 per share instead of making $.90 a share in 2019, a negative swing of $2.55 a share from the first quarter, 2019, guidance.

29.  The decline in full-year 2019 guidance would have been even greater but for the company's unexplained announcement, approved in advance of publication by the defendants, that operating income was going to achieve a "sharp improvement" during the fourth quarter of 2019.  The company's anticipated

Unofficial Copy

improvement was therefore shifted by the defendants from second-half 2019 to fourth quarter 2019.

30.  In a statement made in the second quarter report, defendant Dickson gave no indication that McDermott faced significant difficulty in the months ahead, including impending earnings, cash flow and loan covenant problems.  To the contrary, Mr. Dickson stated in the July 29, 2019, second quarter report:

"Although the company reported mixed results for the second quarter of 2019, we are encouraged by the record-setting level of backlog and new awards. We are also pleased with the visibility we have into expected 2020 revenues, of which $7.4 billion was already in backlog as of the end of the second quarter of 2019. This is well above the $4.2 billion of 2019 revenues we had in backlog this time last year. This strong market posture continues to demonstrate the benefits of our combination with CB&I and the opportunities available in a strong market environment. McDermott has booked more than $19 billion of awards since the May 2018 combination with CB&I, demonstrating continued customer confidence and healthy end markets. Importantly, as of the end of the second quarter of 2019, legacy CB&I projects represented only about 14% of the current backlog. All the awards we've won since the combination were booked under McDermott's stringent risk management protocols, which we believe pave the way for us to deliver consistent margin performance through the application of the One McDermott Way in the execution of this backlog. The company continues to remain on schedule executing the Cameron and Freeport LNG projects. The Cameron settlement agreement we signed earlier this month is a testament to the mutually productive relationship we have built with this customer since the combination – and the associated incentives provided a meaningful contribution to our second quarter results."

"...we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020."

"Looking ahead, our revenue opportunity pipeline remains near a historic high and, more specifically, we are seeing steady upward momentum in a number of key areas. For example, in the strategic area of front end engineering design (FEED), our awards through the first half of 2019 are already more than double what we

Unofficial Copy

won in all of 2018 – in terms of both man-hours and dollar value – and that's especially important as FEED work positions us for EPC opportunities. This year we have booked $1.5 billion of EPC work as a result of FEED work that's been done since the combination. Further, in our Technology business, we are forecasting the number of license sales to increase by 25% this year versus 2018. One of the recent highlights was our selection as the Master Licensor by S-OIL, an affiliate of Saudi Aramco, in support of its ethylene cracker and downstream petrochemicals complex, being developed as a major expansion of S-OIL's existing refinery in South Korea. Our Technology business gives us unparalleled insight into upcoming EPC opportunities, and we see roughly $40 billion of potential EPC pull-through opportunities in the refining and petrochemical markets over the next five years. We believe the petrochemical market, in particular, is poised for another wave of investment in the next 12 to 24 months, with world ethylene capacity expected to increase by more than 40% between 2019 and 2028."

31.  The July 29, 2019, second quarter report was reviewed and approved by the defendants in advance of its publication.  Nowhere in the July 29, 2019, second quarter report did the defendants alert shareholders to the fact that McDermott had already begun a material analysis (the "Financing Case") designed to consider a change in the capital structure of the company.  And nowhere in the July 29, 2019, second quarter report did the defendants alert shareholders to the fact that they were aware that the Cameron LNG project, and other legacy projects as well, were going to continue experiencing substantial losses in the months ahead which would cause the company to incur huge losses, a cash flow drain and loan covenant problems.

32.  Sometime before mid-September, 2019, the Financing Case had been concluded and its result was that McDermott had an avenue to cure its impending financial problems without the need to declare Chapter 11 bankruptcy (business

Unofficial Copy

reorganization).  It is likely the Financing Case included the selling of valuable

company assets such as Lummus Technology to shore up McDermott's balance

sheet.  (McDermott has reported that Lummus is worth upwards of $3 billion.)

"Likely" is used herein because the company never reported the actual details of

the Financing Case.  Neither did the company, with the prior knowledge and at the

direction of the defendants, report to shareholders the highly material fact that the

Financing Plan represented a path to salvation for the company and its

shareholders.

33.  The Financing Case, if implemented, would have prevented McDermott

from having to seek Chapter 11 bankruptcy reorganization.  Why wasn't it

implemented?  Because shortly after the Financing Case was finished, rumors

began to fly in the press that the company was facing financial difficulty and its

stock price collapsed from $6.08 on September 16, 2019, immediately before the

rumors, to $2.16 on September 18, 2019, after the rumors came out.

34.  Literally within hours of the company's stock price losing approximately

two-thirds of its value, McDermott, with the prior knowledge and at the direction

of the defendants, decided to scrap the Financing Plan and declare Chapter 11

bankruptcy.  At the company's Chapter 11 bankruptcy plan confirmation hearing in

the U.S. District Court for the Southern District of Texas, Southern Division, on

March 12, 2020, a company insider with intimate knowledge of the decision-

Unofficial Copy

making process, testified that the reason the company decided to declare Chapter

11 **was because its stock price had collapsed.**

35.   Even though the implementation of the Financing Case would have

saved the company, the company, with the prior knowledge and at the direction of

the defendants, chose Chapter 11 and the subsequent losses, pain and suffering that

would cause for its thousands of McDermott shareholders because the company's

stock price had collapsed.  Why?  Because, as has been noted herein, the majority

of defendant Dickson's and defendant Spence's compensation, as well as a large

part of other insider compensation, at McDermott comes from the award of

McDermott shares.  Declaring bankruptcy would cancel the outstanding shares of

every McDermott shareholder, including the shares owned by the defendants.  But

new shares would be issued in the reorganized company (which would come out of

bankruptcy with a high share value) and the bankruptcy plan calls for defendant

Dickson and other corporate insiders to be granted 7.5% of the new shares.

Assuming the number of pre-bankruptcy shares outstanding (193 million), a

conservative post-bankruptcy share price of $25 and 10% of the post-bankruptcy

7.5% insider share allotment goes to defendant Dickson, defendant Dixon stands to

gain over $36,000,000 from a McDermott bankruptcy (193,000,000 x $25 x .10 x .

075 = $36,187,000), not including his annual salary.  So the plan implemented by

defendants Dickson and Spence was, "Company goes bankrupt, we get rich."

Unofficial Copy

36.  Going bankrupt so company insiders can dramatically improve their financial positions on the backs of regular shareholders who lose their life savings is not a legitimate reason for declaring Chapter 11.  There is no statute or case law that allows a company to declare bankruptcy because its stock price has gone down.

37.  Even though the company had decided in mid-September to declare Chapter 11, the company, with the prior knowledge and at the direction of the defendants, made no notice of its intentions to shareholders or anyone else.  The company, with the prior knowledge and at the direction of the defendants, hid the fact that it had made the decision to declare Chapter 11 bankruptcy from its shareholders.  And while they were doing this, shareholders were buying shares of the company at what they considered to be bargain-basement prices because the company had not disclosed its decision to go bankrupt or the extent of its financial problems.

38.  On September 18, 2019, the company, with the prior knowledge and at the direction of the defendants, issued a terse press release stating that::

"McDermott International, Inc., routinely hires external advisors to evaluate opportunities for the Company.  The Company is taking positive and proactive measures, as we have done in the past, intended to improve its capital structure and the long-term health of its balance sheet."

39.  The press release made no mention of the highly material fact that the company was actively considering or had already decided to declare bankruptcy.

Unofficial Copy

40.  On September 20, 2019, the company, with the prior knowledge and at the direction of the defendants, issued a press release stating that the company had hired Evercore to help it sell Lummus Technology.  The press release made no mention of the highly material fact that the company had already decided to declare bankruptcy.

41.  On October 21, 2019, McDermott, with the prior knowledge and at the direction of the defendants, issued a press release that it had secured financing of $1.7 billion, subject to certain terms, that the company would use to finance working capital and support the issuance of required performance guarantees on new projects.  The tone and tenor of the press release was that the company's liquidity problems had been solved.  Nowhere in the press release was the possibility of bankruptcy even raised.  The press release included a statement from David Dickson, McDermott President and CEO, that:

"This new credit agreement is a continued signal from our lenders that they support McDermott, our underlying business growth strategy and ability to achieve a long-term balance sheet solution.  The Agreement provides near-term liquidity for the Company to manage working capital and provide performance guarantees on expected new awards.  We remain focused on serving our customers' needs, supporting our dedicated employees and maintaining our valued relationships with our subcontractors, suppliers and other business counterparties, all as part of our efforts to enhance out position as a premier, fully integrated provider to technology, engineering and construction solutions to the energy industry."

42.  The press release reiterated McDermott's plan to sell Lummus Technology.

Unofficial Copy

43.  The press release also announced that McDermott had withdrawn it previously stated guidance for full-year 2019.  No new guidance for full-year 2019 was given.  Nowhere in the press release was the highly material fact that McDermott had already decided to declare bankruptcy.

44.  **McDermott failed to disclose that the company was under investigation by the SEC, as noted above, to any of its lenders before they had agreed to provide the $1.7 billion of additional financing to the company.**

45.  On November 4, 2019, McDermott, with the prior knowledge and at the direction of the defendants, released its third quarter results in which it reported a net loss of $1.887 billion, or $10.37 per share.  Most of the loss was due to goodwill and intangible asset write-downs of $1.513 billion recommended by its financial advisors to completely eliminate shareholder retained earnings in advance of McDermott's now planned, but unannounced, Chapter 11 bankruptcy filing. After the write-downs, shareholders' equity in the company was a negative $1.380 billion.  Absent the write-downs, the company reported a loss of $1.80 per share.

46.  The write-down of goodwill and intangible assets was unnecessary and done only for the purpose of fraudulently wiping out shareholder equity so that shareholders could not claim they had a stake in the company or any ownership claims during the planned (but unannounced) bankruptcy filing.

Unofficial Copy

47.  Even though the company had enough liquidity to make the payment, the third quarter report also notified shareholders that the company declined to make the $69 million November 1, 2019, interest payment on its 10.625% senior notes due in 2024.  Instead, the company elected to enter into the 30-day grace period with respect to the payment.

48.  Prior to the third quarter report, the company, with the prior knowledge and at the direction of the defendants, had not made any announcement to shareholders that the third quarter results were going to be terrible.  As noted herein, on October 21, 2019, the company, with the prior knowledge and at the direction of the defendants, issued a press release which, among other things, withdrew the company's full-year, 2019, guidance without updating said guidance even though the company, with the prior knowledge and at the direction of the defendants, had forecast a "sharp improvement" for the fourth quarter just weeks earlier.  Up until two weeks before the November 4, 2019, earnings report, shareholders had no idea that the company was going to wipe out shareholders' equity and instead relied on the misleading and fraudulent full-year 2019 earnings guidance and other fraudulent and misleading statements that they had received with the prior knowledge and at the direction of the defendants.

49.  On November 4, 2019, the day of the third quarter earnings announcement, McDermott reported that defendant Stuart Spence, the company's

Unofficial Copy

Chief Financial Officer whose compensation was $3.6 million in 2018 had resigned "to pursue other opportunities".  Mr. Spence's resignation date was actually November 4, 2019, the date of the disastrous third quarter earnings announcement.  As discussed above, defendant Spence was already the defendant in litigation against him, David Dickson and McDermott which, among other things, accused him of making false and misleading statements relating to McDermott's finances.

50.  Defendant Spence also received a severance payment of $866 thousand and other benefits from McDermott in return for his release of all claims against McDermott and its employees and agents, **including any such matter arising from the negligence, gross negligence or reckless, willful or wanton misconduct of any of the Releasees**.

51.  The release does not include any claims for indemnification for suits filed against Defendant Spence by outside parties during his tenure at McDermott.

52.  The release has a non-disparagement agreement:

"Employee shall refrain from making, directly or indirectly, in any public or private communication (whether oral, written or electronic), any criticisms or negative or disparaging comments or other statements about the Company or any of the other Releasees, or about any aspect of the respective businesses, operations, financial results or prospects of any of the Company Entities, including comments relating to Employee's termination of employment. Notwithstanding the foregoing, it is understood and agreed that nothing in this Section 4(b) or in Section 5 hereof is intended to: (i) prevent Employee from testifying truthfully in any legal proceeding brought by any governmental authority or other third party or interfere with any obligation Employee may have to cooperate with or provide information

Unofficial Copy

to any government agency or commission, subject to compliance with the provisions of Section 5(c) hereof, if applicable; (ii) prevent Employee from advising Employee's spouse of the terms and conditions of this Agreement; or (iii) prevent Employee from consulting with Employee's own legal counsel, as contemplated by Section 7 of this Agreement."

53.   Most importantly, the release has a non-disclosure agreement

prohibiting defendant Spence from disclosing any information to McDermott

analysts or shareholders:

" Employee will not disclose any of the Confidential Information to any securities analysts, shareholders, prospective investors, customers, competitors or any other third party, including any third party who has or may express an interest in acquiring any of the Company Entities or all or any significant portion of their respective outstanding equity securities or assets. If Employee is legally required to disclose any Confidential Information, Employee shall, to the extent not prohibited by applicable law or legal process, promptly notify the Company in writing of such requirement so that the Company or any of the other Company Entities may seek an appropriate protective order or other relief or waive compliance with the nondisclosure provisions of this Section 5 with respect to such Confidential Information. To the extent not prohibited by applicable law, Employee agrees to cooperate with and not to oppose any effort by the Company or any other Company Entity to resist or narrow such request or to seek a protective order or other appropriate remedy. In any such case, Employee will: (i) disclose only that portion of the Confidential Information that, according to written advice of Employee's counsel, is required to be disclosed; (ii) use reasonable best efforts to obtain assurances that such Confidential Information will be treated confidentially; and (iii) to the extent not prohibited by applicable law, promptly notify the Company in writing of the items of Confidential Information so disclosed."

54.   Defendant Spence may have to pay back McDermott for any payments made to him if he breaches the agreement or even if a court or arbitrator finds it invalid or unenforceable:

"Employee agrees that in the event that (i) Employee breaches any term of Sections 3 or 4 hereof or this Section 5, or (ii) Employee challenges the validity of all or any part of this Section 5, and all or any part of this Section 5 is found invalid or unenforceable for any reason whatsoever by a court of competent

Unofficial Copy

jurisdiction or an arbitrator in a proceeding between Employee and a Company Entity, in addition to any other remedies at law or in equity the Company may have available to it, the Company shall not be obligated to make any of the payments and may cease to make such payments or to provide for any of the benefits specified in Section 2 hereof, and shall be entitled to recoup from Employee any and all of the value of the payments and benefits provided pursuant to Section 2 hereof that have vested or been paid pursuant to that Section."

55.  It can be inferred from the above that McDermott may not want the details of its financial operations to become public and that Defendant Spence may know something that McDermott is paying him not to discuss.

56.  McDermott did not release fourth quarter 2019 results.  However, McDermott advisors Evercore, Kirkland & Ellis and AlixPartners estimated that McDermott experienced a fourth quarter operating loss of $141 million, or approximately $.77 per share, even though the defendants had been saying as late as July 29, 2019, (second quarter 2019 earnings release) that operating income was going to achieve a **"sharp improvement"** during the fourth quarter of 2019.

57.  On January 21, 2020, McDermott announced that it was filing a Prepackaged Chapter 11 proceeding in the United States Bankruptcy Court for the Southern District of Texas (Case number 20-30336).  As part of the filing, the company announced that it was proposing that all of the existing outstanding shares of McDermott would be cancelled (declared worthless).

58.  Part of McDermott's bankruptcy Plan filed with the court called for the issuance of new common stock.  **The Management Incentive Plan included in**

Unofficial Copy

**the company's bankruptcy Plan calls for the reservation of 7.5% of the new stock to be used in grants to McDermott management and the company's Board of Directors.  In one fell swoop, McDermott management wiped out all the current shareholders and gave itself and its Board 7.5% of the recapitalized company. As discussed above, a conservative estimate of defendant Dickson's windfall from receiving shares of the recapitalized company is approximately $36,000,000.**

59.  Prior to the January 21, 2020, announcement, McDermott, with the prior knowledge and at the direction of the defendants, had made no announcements to shareholders that it was even considering bankruptcy or that it had decided to declare bankruptcy in mid-September, 2020.  Throughout the entirety of 2019 and up until the January 21, 2020, bankruptcy announcement, the company, with the prior knowledge and at the direction of the defendants, produced and published a continuous stream of positive press releases touting the continued and unparalleled success of the company and its operations.  Not one press release informed shareholders of difficulties the company was experiencing or of the company's decision to declare bankruptcy in mid-September, 2019.

60.  After the January 21, 2020, announcement, McDermott's share price fell to a low of $.01 per share.

Unofficial Copy

61.  On February 27, 2020, plaintiff filed a pleading ("plaintiff's pleading")

asking the bankruptcy court to order a criminal inquiry pursuant to 18 U.S.C.

Section 158(d) and 18 U.S.C. Section 3057 into alleged improper, criminal,

activities pursued by McDermott and its advisors before and during the pendency

of the bankruptcy proceedings.  The defendants were made aware of the pleading

by their bankruptcy attorneys.  Plaintiff's pleading states, in part:


"....Van Deelen alleges that McDermott, certain members of its management and
its advisors, violated 18 U.S.C. Section 152 when they made various false oaths
and accounts to the bankruptcy court, including when they claimed that
McDermott had to re-equitize the company as part of its bankruptcy plan and that
certain documents filed with the court were accurate; violated 18 U.S.C. Section
154 when they failed to provide the U.S. Trustee documents which showed that
they had previously concluded that the company did not have to file for Chapter 11
bankruptcy and documents which showed that, once Chapter 11 bankruptcy was
filed, the company did not have to re-equitize; and violated 18 U.S.C. Section157
when they filed documents with the bankruptcy court purporting to show that
McDermott had to re-equitize the company in order to satisfactorily exit
bankruptcy when they knew that the reason they claimed the need to re-equitize
was so that they could be granted 7.5% of the company's new shares upon
emergence from bankruptcy.
       Van Deelen alleges that McDermott's bankruptcy plan has not been
proposed in good faith and has been proposed by a means forbidden by law in
violation of 11 U.S.C. Section 1129(3) because the plan calls for the cancellation
of existing shares, the elimination of virtually all of the company's outstanding debt
and the re-equitization of the company for the sole purpose of enriching
McDermott's management and Board and not because said cancellation of shares,
elimination of all debt and re-equitization of the company is necessary for the
satisfactory emergence of the company from bankruptcy.
       Van Deelen alleges that McDermott's bankruptcy plan discriminates unfairly
and is not fair and equitable with respect to current shareholders in violation of 11
U.S.C. Section 1129 (b)(1) because it is not necessary to cancel the shares of the
existing shareholders, to eliminate virtually all of the company's outstanding debt

Unofficial Copy

and to re-equitize the company in order for the plan to be viable.  The plan calls for the cancellation of existing shares, the elimination of virtually all of the company's outstanding debt and the re-equitization of the company for the sole purpose of enriching McDermott's management and Board and not because said cancellation of shares, elimination of all debt and re-equitization of the company is necessary for the satisfactory emergence of the company from bankruptcy.

Van Deelen, pursuant to 18 U.S.C. 158(d) and 18 U.S.C. Section 3057, moves the court to refer for investigation the claims of McDermott, certain members of its management and its advisors that McDermott has to re-equitize the company in order to satisfactorily exit bankruptcy.

WHEREFORE, Van Deelen respectfully requests that the Court sustain his opposition and objection to the confirmation of the Debtor's Plan, that the Court grant Van Deelen's proposed Modified Plan, in whole or in part, that the Court order an investigation pursuant to 18 U.S.C. Section 158(d) and 18 U.S.C. Section 3057, and that the Court enter the Order, substantially in the form attached to this Motion (Exhibit 31), granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances."

62.  On March 12, 2020, Shortly after plaintiff's pleading was filed, plaintiff attended McDermott's Plan Confirmation Hearing.  Also in attendance were defendants Dickson and Spence.  After the hearing, plaintiff informed defendant Dickson that plaintiff was going to file suit against him in state court concerning the improprieties defendant Dickson had engaged in with respect to his fraudulently directing and engaging in McDermott's inappropriate, unlawful, bankruptcy petition.

63.  On March 17, 2020, McDermott, with the knowledge and prior approval by defendant Dickson, filed a motion with the bankruptcy court seeking an order asking that shareholder plaintiff be "prohibited from further contact with the debtors [i.e. - McDermott International], their current or former officers, directors,

Unofficial Copy

and employees, their counsel or other professionals and their families." Said

motion was made in retaliation for plaintiff's pleading filed on February 27, 2020,

in the U.S. Bankruptcy Court for the Southern District of Texas and for plaintiff's

informing defendant Dickson on March 12, 2020, that plaintiff intended to sue him

in state court. The motion was intended to prevent and chill plaintiff from

pursuing plaintiff's pleading and plaintiff's planned state court suit against

defendant Dixon. The motion has in fact chilled plaintiff from pursuing his

plaintiff's pleading. Plaintiff has not pursued his plaintiff's pleading and plaintiff

has not attempted to contact McDermott's management team since McDermott's

March 17, 2020, motion was filed even though the bankruptcy court subsequently

denied the motion. Neither has plaintiff attempted to contact McDermott's current

or former officers, directors, employees, counsel or other professionals, even

though other McDermott shareholders are afforded the right to do so.

64. The defendants owed and owe a fiduciary duty to plaintiff which

includes, but is not limited to, not to fraudulently manipulate McDermott's

financial statements and results; not to fraudulently cause the company to file for

bankruptcy protection; not to fail to disclose to the company's lenders that

McDermott was under investigation by the SEC before accepting $1.7 billion of

additional financing from the lenders; to keep plaintiff informed concerning any

adverse factors which are expected to negatively impact earnings; to keep plaintiff

Unofficial Copy

informed concerning any bankruptcy plans the company has and not to attempt to chill and effectively prevent plaintiff from contacting McDermott International and its management team.

## COUNT 1
## CONVERSION

65.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.  At all times material, the plaintiff owned 30,000 shares of McDermott International common stock.

67.  The defendants unlawfully and without authorization assumed and exercised dominion or control over plaintiff's shares to the exclusion of, or inconsistent with, the plaintiff's rights as a shareholder.

68.  The conversion included, but was not limited to, unnecessarily writing down goodwill and intangible assets for no other purpose than destroying shareholder equity in advance of a planned, but unannounced, bankruptcy filing; unnecessarily declaring Chapter 11 bankruptcy for no other purpose than enriching defendant Dixon and other company insiders; announcing that the company was going to cancel the stock of plaintiff and other shareholders in connection with the unnecessary Chapter 11 bankruptcy; and chilling plaintiff from exercising his rights as a shareholder to contact company management and other personnel by asking the bankruptcy court to prevent plaintiff from doing so.

Unofficial Copy

69.  Plaintiff was injured by the conversion which impaired plaintiff's rights as a shareholder and destroyed the value of plaintiff's shares.

70.  Plaintiff seeks actual damages of $180,000.00 and exemplary damages in an amount determined by the trier of fact.

**COUNT 2**
**COMMON LAW FRAUD**

71.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  Count 2 is brought pursuant to Texas common law.

72.  The defendants made or caused to be made statements about McDermott International, its performance and its financial condition which they knew were false, inaccurate or misleading.

73.  The defendants failed to disclose the material facts necessary to make the statements they and their representatives made, in light of the circumstances under which they were made, not misleading.

74.  The defendants did not have a reasonable basis for their alleged false statements and omissions and engaged in practices and a course of business that operated as a fraud and deceit upon the purchasers of McDermott International common stock.

75.  The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse

Page 26

material information about McDermott International, its serious problems, and its effect on McDermott's financial condition.

76. The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal the fact that the implementation of the "Financing Case" would solve the company's cash flow, loan covenant and other problems and avoid the need for the company to declare bankruptcy.

77. Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the true status of McDermott's financial condition and of the "Financing Case".

78. The defendants and their representatives, with prior knowledge and approval of the defendants, made the misrepresentations and omissions of material facts set forth herein with the intent to induce others, including the plaintiff, to rely on such misrepresentations and omissions of material fact.

79. Plaintiff reasonably relied on the defendants' fraudulent and reckless misstatements and omissions in connection with his purchases and retention of McDermott International common stock. Plaintiff relied on these statements both directly to the extent they were personally made to plaintiff and indirectly to the

Unofficial Copy

extent they artificially inflated the market price.  But for the defendants' wrongful conduct, plaintiff would not have purchased and retained his McDermott International stock.

80.  As a direct and proximate result of defendants' wrongful conduct, plaintiff suffered damages in connection with his purchases and his retention of McDermott International common stock in excess of the jurisdictional limits of this Court.

81.  Pursuant to Section 41.003 of the Texas Civil Practice and Remedies Code, plaintiff is entitled to recover exemplary damages in an amount to be determined by the trier of fact.

## COUNT 3
## STATUTORY FRAUD

82.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  Count 3 is brought pursuant to Texas Business & Commercial Code Section 27.01.

83.  The defendants made or caused to be made statements about McDermott International, its performance, its financial condition and its outlook which they knew were false.

84.  The defendants made these misrepresentations of material fact to investors, including plaintiff, for the purpose of inducing them to rely on such

Page 28

Unofficial Copy

misrepresentations of material fact to purchase and/or retain McDermott International stock.

85.  Despite knowing that these statements were false, the defendants failed to disclose the falsity of these statements to plaintiff, investors and regulatory authorities.

86.  Plaintiff reasonably relied on the defendants fraudulent misstatements in connection whit his purchases of McDermott stock.  Plaintiff relied on these statements both directly to the extent they were personally made to plaintiff and indirectly to the extent they artificially inflated the market price.  But for the defendants' wrongful conduct, plaintiff would not have purchased and retained his McDermott International stock.

87.  The defendants made or caused to be made statements about McDermott's need to declare bankruptcy which they knew were false.

88.  The defendants made these misrepresentations of material fact to investors and regulatory authorities so that they could reap tens of millions of dollars in inappropriate, unearned, windfall stock grants and salary increases as the result of the bankruptcy and recapitalization of McDermott International.

89.  Despite knowing that these statements were false, the defendants failed to disclose the falsity of these statements to plaintiff, investors and regulatory authorities.

Unofficial Copy

90.  As a direct and proximate result of the defendants' wrongful conduct, plaintiff suffered damages in connection with his purchases and retention of McDermott International stock in excess of the jurisdictional limits of this Court.

91.  As a direct and proximate result of their false statements, the individual defendants benefitted, or will benefit, from the inflated stock price and the inappropriate, unearned, windfall stock grants and salary increases they received, or will receive, as the result of the bankruptcy and recapitalization of McDermott International.

92.  Pursuant to Texas Business & Commercial Code Sections 27.01(c)-(d), plaintiff is entitled to recover exemplary damages in an amount to be determined by the trier of fact.

93.  Pursuant to Texas  Business & Commercial Code Section 27.01(e), plaintiff is entitled to recover reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions and costs of court.

### COUNT 4
### NEGLIGENT MISREPRESENTATION

94.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  Count 4 is brought pursuant to Texas common law.

95.  The defendants, individually and through their representatives, negligently made false and misleading representations to the plaintiff and failed to disclose material facts to the plaintiff.

Unofficial Copy

96.  The defendants made these negligent misrepresentations and omissions of material fact to plaintiff for the purpose of inducing plaintiff to rely on such misrepresentations and omissions of material fact to purchase and/or to retain McDermott International common stock.

97.  Plaintiff justifiably relied on the defendants' misrepresentations and omissions of material fact in purchasing and retaining his McDermott International common stock.

98.  Plaintiff would not have purchased McDermott International stock if plaintiff had been provided accurate and not misleading information by the defendants about the company, its outlook, its financial condition and the defendants plan to wrongly take the company into bankruptcy.

99.  As a direct and proximate result of the defendants' misrepresentations and omissions of material fact, plaintiff suffered damages in connection with his purchase and/or retention of McDermott International common stock in excess of the jurisdictional limits of this Court.

## COUNT 5
## BREACH OF FIDUCIARY DUTY

100.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.  The plaintiff and each defendant had a fiduciary relationship.

102.  The defendants breached their fiduciary duties to the plaintiff.

Unofficial Copy

103.  The defendants' breaches proximately caused injury to the plaintiff.

104.  The defendants' breaches resulted in benefits to the defendants.

105.  Plaintiff seeks actual damages in excess of the jurisdictional limits of this Court and exemplary damages in an amount to be determined by the trier of fact.

### COUNT 6
### CONSPIRACY

106.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

107.  The defendants were members of a combination of two or more persons.

108.  The object of the combination was to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

109.  The members had a meeting of the minds on the object or course of action.

110.  One of the members committed an unlawful, overt act to further the object or course of action.

111.  The plaintiff suffered injury as a proximate result of the wrongful act.

112.  Plaintiff seeks actual damages in excess of the jurisdictional limits of this Court and exemplary damages in an amount to be determined by the trier of fact.

Unofficial Copy

## DISCOVERY RULE AND FRAUDULENT CONCEALMENT

113.  Plaintiff asserts all applicable state statutory, common law and contractual rights and theories related to the tolling and/or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule, and/or fraudulent concealment.

## JURY DEMAND

114.  Plaintiff demands a trial by jury on all issues so triable.

## PRAYER

WHEREFORE, Plaintiff prays that defendants be cited to appear herein and, after a trial on the merits, that the Court enter judgment awarding plaintiff the following:

1.  actual damages;

2.  exemplary damages;

3.  costs;

4.  pre-judgment and post-judgment interest as allowed by law; and

5.  all such other and further relief, both general and special, at equity and at law, to which plaintiff may be justly entitled.

Unofficial Copy

Respectfully submitted,


/s/ Michael Van Deelen
Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

Plaintiff

Unofficial Copy

# Document 2

Received and E-Filed for Record
6/23/2020 11:16 AM
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Kristan Weesner-Malo



# Request for Service
## Montgomery County District Clerk

CASE NUMBER: 20-06-07348   CURRENT COURT: Montgomery County - District Clerk

Name(s) of Documents to be served: 1. Plaintiff's Original Petition
2. Citation

FILE DATE of document(s) to be served: 6/23/2020   Month/Day/Year

SERVICE TO BE ISSUED ON (Please List Exactly as The Name Appears in The Pleading to Be Served):

Issue Service to: Scott Lamb

Address of Service: 29 Watermill Ct

City, State & Zip: The Woodlands, TX 77380

Agent (if applicable): _____

☒ Check here to have citation addressed to wherever the addressee may be found.

TYPE OF SERVICE/PROCESS TO BE ISSUED: (Check the appropriate box)

| | | |
|---|---|---|
| ☒ Citation for Personal Service | ☐ Secretary of State Citation ($12.00) | ☐ Civil Injunction/TRO |
| ☐ Citation by Posting | ☐ Highway Commission ($12.00) | ☐ Precept |
| ☐ Citation by Publication | ☐ Commissioner of Insurance ($12.00) | ☐ Subpoena |
| ☐ Citation Scire Facias | ☐ Capias (not an E-Issuance) | ☐ Other (Please describe) |
| ☐ Writ of Garnishment | ☐ Temporary Restraining Order (Family) | |
| ☐ Writ of Sequestration | ☐ Temporary Ex Parte Protective Order | |
| ☐ Writ of Attachment | ☐ Notice of Appl. For Protective Order | |
| ☐ Writ of Habeas Corpus | ☐ Notice of Hearing/Show Cause | (See additional forms for Post Judgment Service) |
| ☐ Notice of Foreign Judgment (UIFSA) | | |
| ☐ Notice of Foreign Judgment (UCCJEA)   (by certified mail service) | | |
| ☐ Writ of Withholding   ($15.00 - certified mail by District Clerk only) | | |
| ☐ Notice of Termination of Child Support ($15.00 - certified mail by District Clerk only) | | |

SERVICE BY: (Check the appropriate box.)

☒ E-Issuance by District Clerk (No Service Copy Fees Charged) (Note: CAPIAS is not an E-Issuance Option

*Citations returned electronically will be e-served through E-file Texas to requesting attorney/pro se.

☐ ATTORNEY PICK-UP (phone or email contact): _____
☐ MAIL to attorney at Attorney of Record's address on file in case record.
☐ CERTIFIED MAIL by District Clerk
☐ Regular Mail (only available for Expedited Foreclosures and UIFSA Foreign Judgments
☐ CIVIL PROCESS SERVER - Authorized Person to Pick-up: _____   Phone: _____
☐ OTHER, explain: _____

Issuance of Service requested by:

Attorney/Party Name: Michael Van Deelen   Bar# or ID: N/A (pro se)

Mailing Address: 16215 Friar Circle, Spring, TX 77379

Phone Number: 832-562-0723

Unofficial Copy



# Request for Service
## Montgomery County District Clerk

CASE NUMBER: 20-06-07348   CURRENT COURT: Montgomery County - District Clerk

Name(s) of Documents to be served: 1. Plaintiff's Original Petition 2. Citation

FILE DATE of document(s) to be served: 6/23/2020   Month/Day/Year

SERVICE TO BE ISSUED ON (Please List Exactly as The Name Appears in The Pleading to Be Served):

Issue Service to: David Dickson

Address of Service: C/O McDermott International, 757 N. Eldridge Pkwy

City, State & Zip: Houston, TX 77079

Agent (if applicable): _____

☒ Check here to have citation addressed to wherever the addressee may be found.

TYPE OF SERVICE/PROCESS TO BE ISSUED: (Check the appropriate box)

☒ Citation for Personal Service ☐ Secretary of State Citation ($12.00) ☐ Civil Injunction/TRO
☐ Citation by Posting ☐ Highway Commission ($12.00) ☐ Precept
☐ Citation by Publication ☐ Commissioner of Insurance ($12.00) ☐ Subpoena
☐ Citation Scire Facias ☐ Capias (not an E-Issuance) ☐ Other (Please describe)
☐ Writ of Garnishment ☐ Temporary Restraining Order (Family)
☐ Writ of Sequestration ☐ Temporary Ex Parte Protective Order _____
☐ Writ of Attachment ☐ Notice of Appl. For Protective Order _____
☐ Writ of Habeas Corpus ☐ Notice of Hearing/Show Cause _____
☐ Notice of Foreign Judgment (UIFSA) (See additional forms for
☐ Notice of Foreign Judgment (UCCJEA)   (by certified mail service) Post Judgment Service)
☐ Writ of Withholding   ($15.00 - certified mail by District Clerk only)
☐ Notice of Termination of Child Support ($15.00 - certified mail by District Clerk only)

SERVICE BY: (Check the appropriate box.)

☒ E-Issuance by District Clerk (No Service Copy Fees Charged) (Note:) CAPIAS is not an E-Issuance Option
*Citations returned electronically will be e-served through E-file Texas to requesting attorney/pro se.
☐ ATTORNEY PICK-UP (phone or email contact): _____
☐ MAIL to attorney at Attorney of Record's address on file in case record.
☐ CERTIFIED MAIL by District Clerk
☐ Regular Mail (only available for Expedited Foreclosures and UIFSA Foreign Judgments
☐ CIVIL PROCESS SERVER - Authorized Person to Pick-up: _____ Phone: _____
☐ OTHER, explain: _____

Issuance of Service requested by:

Attorney/Party Name: Michael Van Deelen   Bar# or ID: N/A (Pro Se)

Mailing Address: 16215 Friar Circle, Spring, TX 77379

Phone Number: 832-562-0723

Unofficial Copy



# Request for Service
## Montgomery County District Clerk

CASE NUMBER: 20-06-07348   CURRENT COURT: Montgomery County - District Clerk

Name(s) of Documents to be served: 1. Plaintiff's Original Petition
2. Citation

FILE DATE of document(s) to be served: 6/23/2020 Month/Day/Year

SERVICE TO BE ISSUED ON (Please List Exactly as The Name Appears in The Pleading to Be Served):

Issue Service to: Stuart Spence

Address of Service: 301 Hedwig Street

City, State & Zip: Houston, TX 77024

Agent (if applicable): _____

☒ Check here to have citation addressed to wherever the addressee may be found.

TYPE OF SERVICE/PROCESS TO BE ISSUED: (Check the appropriate box)

| | | |
|---|---|---|
| ☒ Citation for Personal Service | ☐ Secretary of State Citation ($12.00) | ☐ Civil Injunction/TRO |
| ☐ Citation by Posting | ☐ Highway Commission ($12.00) | ☐ Precept |
| ☐ Citation by Publication | ☐ Commissioner of Insurance ($12.00) | ☐ Subpoena |
| ☐ Citation Scire Facias | ☐ Capias (not an E-Issuance) | ☐ Other (Please describe) |
| ☐ Writ of Garnishment | ☐ Temporary Restraining Order (Family) | |
| ☐ Writ of Sequestration | ☐ Temporary Ex Parte Protective Order | |
| ☐ Writ of Attachment | ☐ Notice of Appl. For Protective Order | |
| ☐ Writ of Habeas Corpus | ☐ Notice of Hearing/Show Cause | (See additional forms for Post Judgment Service) |
| ☐ Notice of Foreign Judgment (UIFSA) | | |
| ☐ Notice of Foreign Judgment (UCCJEA) | (by certified mail service) | |
| ☐ Writ of Withholding   ($15.00 - certified mail by District Clerk only) | | |
| ☐ Notice of Termination of Child Support ($15.00 - certified mail by District Clerk only) | | |

SERVICE BY: (Check the appropriate box.)

☒ E-Issuance by District Clerk (No Service Copy Fees Charged) (Note:) **CAPIAS is not an E-Issuance Option**
*Citations returned electronically will be e-served through E-file Texas to requesting attorney/pro se.

☐ ATTORNEY PICK-UP (phone or email contact): _____

☐ MAIL to attorney at Attorney of Record's address on file in case record.

☐ CERTIFIED MAIL by District Clerk

☐ Regular Mail (only available for Expedited Foreclosures and UIFSA Foreign Judgments

☐ CIVIL PROCESS SERVER - Authorized Person to Pick-up: _____ Phone: _____

☐ OTHER, *explain*: _____

Issuance of Service requested by:

Attorney/Party Name: Michael Van Deelen   Bar# or ID: N/A (Pro Se)

Mailing Address: 16215 Friar Circle, Spring, TX 77379

Phone Number: 832-562-0723

Unofficial Copy

Document 3

Received and E-Filed for Record
6/29/2020 1:09 PM
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Vanessa Medina

# CITATION
**Cause Number: 20-06-07348**

| | |
|---|---|
| **Clerk of the Court** | **Attorney Requesting Service** |
| Melisa Miller | Michael Van Deelen |
| P.O. Box 2985 | 16215 Friar Circle |
| Conroe, Texas 77305 | Spring TX  77379 |

## THE STATE OF TEXAS

**NOTICE TO DEFENDANT: You have been sued.  You may employ an attorney.  If you or your attorney does not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.**

To:     Scott Lamb
        29 Watermill Ct
        The Woodlands TX  77380
        **OR WHEREVER THE ADDRESSEE MAY BE FOUND**

You are hereby commanded to appear by filing a written answer to the Plaintiff's Original Petition at or before 10:00 A.M. of the Monday next after the expiration of twenty days after the date of service of this citation before the Honorable 284th Judicial District Court Montgomery County, Texas at the Courthouse of said County in Conroe, Texas.

Said Plaintiff's Original Petition was filed in said court on this the 23rd day of June, 2020 numbered 20-06-07348 on the docket of said court, and styled, **Michael Van Deelen VS. David Dickson, and Stuart Spence, and Scott Lamb, and 10 John/Jane Does**

The nature of plaintiff's demand is fully shown by a true and correct copy of the  Plaintiff's Original Petition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to requirements of law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at Conroe, Texas on this the 23rd day of June, 2020.

Melisa Miller, District Clerk
Montgomery County, Texas



By: _Patricia Morrill_ _____
**Patricia Morrill, Deputy**          6/23/2020 2:07:46 PM

Unofficial Copy

## OFFICER'S RETURN

Cause No. 20-06-07348                    Court No: 284th Judicial District Court

Style: Michael Van Deelen VS. David Dickson, and Stuart Spence, and Scott Lamb, and 10 John/Jane Does

To:          Scott Lamb
Address:     29 Watermill Ct
             The Woodlands TX  77380
             OR WHEREVER THE ADDRESSEE MAY BE FOUND

Came to hand the  24 day of   June          , 20 20, at   1:31 PM o'clock, and executed in   Montgomery
County, Texas by delivering to each of the within named defendants in person, a true copy of this citation with the date of delivery endorsed thereon, together with the accompanying copy of the  Plaintiff's Original Petition at the following times and places, to wit:

| Name | Date/Time | Place, Course and distance from Courthouse |
|------|-----------|---------------------------------------------|
| Scott Lamb | 6/27/2020  10:38AM | 29 Watermill Ct. The Woodlands, Texas 77380 |

Manner of service:   Personal Delivery

*And not executed as to the defendants(s) _____
The diligence used in finding said defendant(s) being:
_____
And the cause of failure to execute this process is:
_____
And information received as to the whereabouts of said defendant(s) being:
_____

FEES:
Serving Petition and Copy    $_____

TOTAL                        $_____          _____OFFICER

                                                  _____County, Texas

                                                  By: _____, Deputy

AFFIANT
Complete if you are a person other than a Sheriff, Constable, or Clerk of the Court. In accordance with Rule 107: the officer, or authorized person who services, or attempts to serve a citation shall sign and return. The return must either be verified or be signed under penalty of perjury.

A return signed under penalty of perjury must contain the statement below in substantially the following form:
My full name is  Douglas Greene
My date of birth is   01 / 04 / 1968, and my address is
4008 Louetta Rd. #622 Spring, Texas 77388    .
I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT
Executed in  Harris          , County, State of
Texas        , on the  29  day of  June         , 20  20 .

_____
Declarant/Authorized Process Server
 PSC# 11914  Exp 3/31/2021
ID# & Exp. Of Certification

_____
Declarant/Authorized Process Server

ID# & Exp. Of Certification

SWORN AND SUBSCRIBED ON

_____
DATE

_____
NOTARY

Unofficial Copy

# Document 4

Received and E-Filed for Record
7/2/2020 4:40 PM
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Kristan Weesner-Malo

# CITATION

### Cause Number: 20-06-07348

| | |
|---|---|
| **Clerk of the Court** | **Attorney Requesting Service** |
| Melisa Miller | Michael Van Deelen |
| P.O. Box 2985 | 16215 Friar Circle |
| Conroe, Texas 77305 | Spring TX  77379 |

## THE STATE OF TEXAS

**NOTICE TO DEFENDANT: You have been sued.  You may employ an attorney.  If you or your attorney does not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.**

To:     David Dickson
        McDermott International
        757 N Eldridge Pkwy
        Houston TX  77079
        OR WHEREVER THE ADDRESSEE MAY BE FOUND

You are hereby commanded to appear by filing a written answer to the Plaintiff's Original Petition at or before 10:00 A.M. of the Monday next after the expiration of twenty days after the date of service of this citation before the Honorable 284th Judicial District Court Montgomery County, Texas at the Courthouse of said County in Conroe, Texas.

Said Plaintiff's Original Petition was filed in said court on this the 23rd day of June, 2020 numbered 20-06-07348 on the docket of said court, and styled, Michael Van Deelen VS. David Dickson, and Stuart Spence, and Scott Lamb, and 10 John/Jane Does

The nature of plaintiff's demand is fully shown by a true and correct copy of the  Plaintiff's Original Petition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to requirements of law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at Conroe, Texas on this the 23rd day of June, 2020.

Melisa Miller, District Clerk
Montgomery County, Texas

By: _Patricia Morrill_
Patricia Morrill, Deputy          6/23/2020 2:08:01 PM

Unofficial Copy

# OFFICER'S RETURN

Cause No. 20-06-07348                    Court No: 284th Judicial District Court

Style: Michael Van Deelen VS. David Dickson, and Stuart Spence, and Scott Lamb, and 10 John/Jane Does

To:        **David Dickson**
Address:   **McDermott International**
           **757 N Eldridge Pkwy**
           **Houston TX  77079**
           **OR WHEREVER THE ADDRESSEE MAY BE FOUND**

Came to hand the 24 day of __June__, 20 20 at __1:31P__ o'clock, and executed in __Montgomery__ County, Texas by delivering to each of the within named defendants in person, a true copy of this citation with the date of delivery endorsed thereon, together with the accompanying copy of the  Plaintiff's Original Petition at the following times and places, to wit:

| Name | Date/Time | Place, Course and distance from Courthouse |
|------|-----------|--------------------------------------------|
| David Dickson | 6/30/2020  3:05PM | 1925 Hughes Landing Blvd Parking Lot Whole Foods The Woodlands, |

**Manner of service:** Personally Delivered to Stephen A. Stallings Authorized Person and Sr. Director of Litigation and Disputes

**\*And not executed as to the defendants(s)** _____
The diligence used in finding said defendant(s) being:

_____

And the cause of failure to execute this process is:
_____

And information received as to the whereabouts of said defendant(s) being:
_____

**FEES:**
Serving Petition and Copy    $_____

                                        _____**OFFICER**

**TOTAL**          $_____
                              _____**County, Texas**

                    **By:** _____, **Deputy**


**AFFIANT**

Complete if you are a person other than a Sheriff, Constable, or Clerk of the Court. In accordance with Rule 107: the officer, or authorized person who services, or attempts to serve a citation shall sign and return. The return must either be verified or be signed under penalty of perjury.

A return signed under penalty of perjury must contain the statement below in substantially the following form:

My full name is  Douglas Greene

My date of birth is  01 / 04 /1968 , and my address is
 4008 Louetta Rd. #622 Spring, Texas 77388 .

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT**

Executed in Harris , County, State of
 Texas , on the 2nd day of  July , 20 20 .

_____
**Declarant/Authorized Process Server**
 PSC#11914 Exp 3/31/2021
**ID# & Exp. Of Certification**

_____
**Declarant/Authorized Process Server**

**ID# & Exp. Of Certification**

**SWORN AND SUBSCRIBED ON**

_____
**DATE**

_____
**NOTARY**

# Document 5

Received and E-Filed for Record
7/2/2020 4:41 PM
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Kristan Weesner-Malo

# CITATION

### Cause Number: 20-06-07348

Clerk of the Court                              Attorney Requesting Service
Melisa Miller                                   Michael Van Deelen
P.O. Box 2985                                   16215 Friar Circle
Conroe, Texas 77305                             Spring TX  77379

## THE STATE OF TEXAS

**NOTICE TO DEFENDANT: You have been sued.  You may employ an attorney.  If you or your attorney does not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.**

To:     Stuart Spence
        301 Hedwig St
        Houston TX  77024
        **OR WHEREVER THE ADDRESSEE MAY BE FOUND**

You are hereby commanded to appear by filing a written answer to the Plaintiff's Original Petition at or before 10:00 A.M. of the Monday next after the expiration of twenty days after the date of service of this citation before the Honorable 284th Judicial District Court Montgomery County, Texas at the Courthouse of said County in Conroe, Texas.

Said Plaintiff's Original Petition was filed in said court on this the 23rd day of June, 2020 numbered 20-06-07348 on the docket of said court, and styled, **Michael Van Deelen VS. David Dickson, and Stuart Spence, and Scott Lamb, and 10 John/Jane Does**

The nature of plaintiff's demand is fully shown by a true and correct copy of the  Plaintiff's Original Petition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to requirements of law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at Conroe, Texas on this the 23rd day of June, 2020.

Melisa Miller, District Clerk
Montgomery County, Texas

By: *Patricia Morrill*
6/23/2020 2:08:16 PM
Patricia Morrill, Deputy

Unofficial Copy

# OFFICER'S RETURN

**Cause No. 20-06-07348**          **Court No: 284th Judicial District Court**

**Style: Michael Van Deelen VS. David Dickson, and Stuart Spence, and Scott Lamb, and 10 John/Jane Does**

**To:**          Stuart Spence
**Address:**     301 Hedwig St
                 Houston TX  77024
                 **OR WHEREVER THE ADDRESSEE MAY BE FOUND**

**Came to hand the** _24_ **day of** _June_, **20** _20_, **at** _1:31 P_ **o'clock, and executed in** _Harris_ **County, Texas by delivering to each of the within named defendants in person, a true copy of this citation with the date of delivery endorsed thereon, together with the accompanying copy of the Plaintiff's Original Petition at the following times and places, to wit:**

| Name | Date/Time | Place, Course and distance from Courthouse |
|------|-----------|--------------------------------------------|
| Stuart Spence | 6/30/2020  10:25AM | 301 Hedwig St. Houston, Texas 77024 |

**Manner of service:** _Personal Delivery_

**\*And not executed as to the defendants(s)** _____

**The diligence used in finding said defendant(s) being:**
_____

**And the cause of failure to execute this process is:**
_____

**And information received as to the whereabouts of said defendant(s) being:**
_____

**FEES:**

**Serving Petition and Copy**   $_____

**TOTAL**                       $_____        _____**OFFICER**

                                                   _____**County, Texas**

                                       **By:** _____**, Deputy**


**AFFIANT**

**Complete if you are a person other than a Sheriff, Constable, or Clerk of the Court. In accordance with Rule 107: the officer, or authorized person who services, or attempts to serve a citation shall sign and return. The return must either be verified or be signed under penalty of perjury.**

**A return signed under penalty of perjury must contain the statement below in substantially the following form:**

**My full name is** _Douglas Greene_____

**My date of birth is** _01 / 04 / 1968_, **and my address is**
_4008 Louetta Rd. #622 Spring, Texas 77388_.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT**

**Executed in** _Harris_____, **County, State of**
_Texas_____, **on the** _2nd_ **day of** _July_____, **20** _20_.

_____

**Declarant/Authorized Process Server**
_PSC#11914 Exp 3/31/2021_____
**ID# & Exp. Of Certification**

_____

**Declarant/Authorized Process Server**

_____

**ID# & Exp. Of Certification**

**SWORN AND SUBSCRIBED ON**

_____

**DATE**

_____

**NOTARY**

Unofficial Copy