United States Courts
Southern District of Texas
F I L E D

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

APR 0 8 2021

Nathan Ochsner, Clerk of Court

| | |
|---|---|
| In re: | ) |
| | ) |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) |
| | ) |
| Reorganized Debtor(s). | ) |
| | ) |
| _____ | ) |
| | ) |
| MICHAEL VAN DEELEN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DAVID DICKSON, | ) |
| and STUART SPENCE, | ) |
| and SCOTT LAMB, | ) |
| and 10 JOHN/JANE DOES | ) |
| | ) |
| Defendants. | ) |

Chapter 11

Case No. 20-30336

(Jointly Administered)

Adv. Proc. No. 20-3309

## PLAINTIFF'S FIRST AMENDED PETITION

COMES NOW, the Plaintiff, Michael Van Deelen, and submits his

Plaintiff's First Amended Petition (Exhibit A herein) as follows:

1.  Plaintiff's Original Petition was a state law cause of action that was filed

in state court (Montgomery County, Texas, District Court) but removed to Federal

Court by the defendants.

2.  On March 10, 2021, a hearing was held in the instant action before the Honorable David R. Jones of the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

3.  Plaintiff's First Amended Petition (Exhibit A) is also a state law cause of action which has been filed in response to Judge Jones' instruction during the March 10, 2021, hearing to file an amended petition containing only state law claims as preparatory to having this case remanded to state court.

Respectfully submitted,

/s/ Michael Van Deelen
Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com
Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this 8th day of April, 2021, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.


/s/ Michael Van Deelen
Michael Van Deelen

# EXHIBIT A

CAUSE NO. 20-06-07348

| | | |
|---|---|---|
| MICHAEL VAN DEELEN | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | OF MONTGOMERY COUNTY, |
| | § | TEXAS |
| DAVID DICKSON, | § | |
| and STUART SPENCE, | § | |
| and SCOTT LAMB, | § | 284th JUDICIAL DISTRICT |
| and 10 JOHN/JANE DOES | § | |
| Defendants. | § | |

## PLAINTIFF'S FIRST AMENDED PETITION

COMES NOW Michael Van Deelen, plaintiff in the above-styled state law

cause of action, and for his cause of action shows as follows:

(NOTE: This is a state law cause of action that was filed in state court but removed

to Federal Court by the defendants. This Plaintiff's First Amended Petition is also

a state law cause of action which has been filed in response to the (Federal

Bankruptcy) Court's instruction on March 10, 2021, to file an amended petition

containing only state law claims as preparatory to having this case remanded to

state court.)

## DISCOVERY CONTROL PLAN

1.  Plaintiff intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure 190.3.

## PARTIES

2.  Defendant Scott Lamb is an individual residing in Montgomery County, Texas, who can be served at his residence: 29 Watermill Ct, The Woodlands, Tx, 77380.  At all times material herein, defendant Lamb was McDermott International's Vice President of Investor Relations.

3.  Defendant David Dickson is an individual believed to be residing in either Montgomery County, Texas, or Harris County, Texas, who can be served at McDermott International, 757 N. Eldridge Pkwy, Houston, Tx, 77079.  At all times material herein, defendant Dickson was the President and Chief Executive Officer of McDermott International.

4.  Defendant Stuart Spence is an individual residing in Harris County, Texas, who can be served at his residence: 301 Hedwig Street, Houston, Tx, 77024.  At all times material herein, until 11/4/2019, defendant Spence was the Executive Vice President and Chief Financial Officer of McDermott International.

5.  The 10 John/Jane Doe defendants, if any, will be identified through the process of discovery.

## JURISDICTION AND VENUE

6. This Court has personal jurisdiction over the defendants because they (a) have, at all material times, conducted business in Texas; (b) have committed tortuous actions, in whole or in part, in Texas; and (c) have sufficient minimum contact with Texas such that the assumption of jurisdiction will not offend traditional notions of fair play and substantial justice.

7. Plaintiff seeks monetary relief of $180,000.00, plus exemplary damages, and the damages sought are therefore within the jurisdictional limit of this Court.

8. Venue is proper in Montgomery County, Texas, pursuant to Section 15.002(a)(2) of the TEX. CIV. PRAC. & REM. CODE because it was the residence of one or more of the defendants at the time plaintiff's causes of action accrued.

9. The following is alleged on information and belief.

## FACTUAL ALLEGATIONS

**Defendants Dickson and Spence Have a History of Being Accused of Making Material Misrepresentations and Omissions in Their Communications to the Investing Public.**

10. On November 15, 2018, a complaint was filed in the United States District Court for the Southern District of Texas seeking class action status on behalf of purchasers of McDermott International ("McDermott") common stock

and alleging damages on their behalf arising from McDermott's allegedly false and misleading statements during the class period from January 24, 2018, to October 30, 2018. The case is captioned *Edwards v. McDermott International, Inc., et al,* No. 4:18-cv-04330. The defendants in the case are McDermott; David Dickson, McDermott's President and CEO; and Stuart Spence, McDermott's Chief Financial Officer (who left McDermott on 11/4/2019). The plaintiff in that case has alleged that the defendants made material misrepresentations and omissions about the integration of the CB&I (Chicago Bridge and Iron) business, certain CB&I projects and their fair values, and McDermott's business, prospects and operations.

11. On January 14, 2019, a related action was filed in the United States District Court for the Southern District of Texas seeking class action status on behalf of all shareholders of McDermott common stock as of April 4, 2018, who had the right to vote on the McDermott/CB&I Combination, captioned: *The Public Employees Retirement System of Mississippi v. McDermott International, Inc., et al,* No.4:19-cv-00135. The plaintiff in that case has alleged the defendants, which include Mr. Dickson and Mr. Spence, made material misrepresentations and omissions in the proxy statement McDermott used in connection with the Combination. The court granted McDermott's motion to consolidate the two actions on February 22, 2019. The case is ongoing.

12.  On July 26, 2019, the Securities and Exchange Commission ('SEC') sent a letter, accompanied by subpoenas, notifying McDermott International that it was under investigation for failing to properly disclose projected losses on its Cameron LNG (Hackberry) project (which was part of CB&I when McDermott acquired that company).

**Timeline of Events**

13.  On May 10, 2018, McDermott completed its merger with Chicago Bridge and Iron ("CBI").  With this merger, McDermott inherited two CBI projects: the Cameron, Louisiana, LNG (liquefied natural gas) project and the Freeport, Texas, LNG project.  Each of these projects were fixed price projects, which meant that any cost overruns would be borne by McDermott.  Cost overruns, which McDermott internally projected to be in the hundreds of millions of dollars, began almost immediately, particularly at Cameron.  The projected cost overruns, though highly material, were not disclosed to plaintiff or the investing public by the defendants.

14.  Not long thereafter, as seen below, the losses became so great that McDermott was running out of cash.  As seen below, the company, with the knowledge and at the direction of the defendants, decided in September, 2019, that its only alternative was to file for Chapter 11 bankruptcy.

15. Defendants Dickson and Spencer receive(d) the majority of their annual compensation in McDermott stock.  For example, defendant Dickson's total remuneration in 2018 exceeded $11 million, most of which came from stock awards, and defendant Spence's total 2018 remuneration was $3.6 million, most of which also came from stock awards.

16. If the very bad outlook for McDermott, including the projected losses from Cameron and Freeport and the company's plan to file bankruptcy, would have become known to the public, McDermott's share price would have fallen precipitously and defendants Dickson's and Spence's annual remuneration from stock grants would have all but evaporated.  To prevent this from happening, the defendants agreed on a scheme ("the scheme") to artificially inflate McDermott's share price by not disclosing the company's true financial condition and outlook, including material current and projected losses from the Cameron and Freeport projects and elsewhere, and the company's impending bankruptcy to plaintiff and the investing public.  (See below.)

17. Defendants Dickson, Spence and Lamb were equal participants in the scheme and they each approved all actions taken by each other pursuant to the scheme.  Pursuant to the scheme, the defendants intentionally or negligently committed the following acts in order to maintain McDermott's share price at an artificially high, inflated, level it would not have been at had the material

misrepresentations and omissions concerning the company's financial condition and outlook not been made.

18.  On March 22, 2019, the defendants, in concert with one another and in furtherance of the scheme or through negligence, published a letter to the company's website.  The letter, viewed by the plaintiff on or about April 3, 2019, contained material misrepresentations and omissions concerning McDermott's financial condition and outlook.  For example:

"Today, we are a fundamentally different and much larger company, as compared to where we were at the end of 2017, with a formidable new presence in significant onshore markets."

"Thanks to the tremendous amount of hard work and dedication of our Board, executive management and employees during 2018, we are ahead of schedule in becoming a premier, fully integrated, global engineering, procurement, construction and installation ("EPCI") provider, with product solutions spanning onshore and offshore from concept to commissioning."

"Looking forward to 2019, our end markets are growing.  We are continuing to see recovery in the offshore and subsea, LNG and downstream markets, with the highest McDermott revenue opportunity pipeline in our history.  Today, McDermott is well-positioned to offer the technology-led, vertically-integrated solutions that we know our customers are seeking.  We believe that McDermott

has the right strategy in place to play a major role in the next chapter of global energy solutions."

19. At the time the letter was published, the defendants were aware that McDermott's Cameron LNG project was in trouble and had estimated probable losses of over $1 billion (approximately $3.50 per share). Although the projected losses were highly material, they were hidden from plaintiff and the investing public so that the defendants could continue to receive vast remuneration through stock grants at inflated stock prices.

20. On April 29, 2019, McDermott released its first quarter 2019 report, which was posted on the company's website and read by the plaintiff on or about May 6, 2019. The report, written, reviewed and approved by the defendants in concert with one another and in furtherance of the scheme or through negligence, materially overstated the results the company had achieved as well as its outlook. In part, the report stated:

"More broadly, the company continues to exhibit commercial success in a steadily improving market. In particular, McDermott reported a book-to-bill ratio of 3.0x, a new award total of $6.7 billion and a 41% sequential-quarter improvement in backlog."

21.  The report released McDermott's full-year 2019 earnings guidance, which predicted strong second-half 2019 results.  The guidance predicted that McDermott's full year earnings per share would be $.90

22.  Nowhere in the first quarter report or the full-year guidance were public investors informed of the significant losses being accrued by the company's Cameron LNG project.  In furtherance of the scheme or through negligence, these losses were not included in the first quarter results or in the full-year projections.

23.  McDermott held its annual meeting on May 2, 2019.  All reports, slides and presentations given at the meeting were reviewed and approved in advance of the meeting by the defendants in concert with one another and in furtherance of the scheme or through negligence.  The meeting presentation was included on McDermott's website and was viewed by plaintiff on or about May 15, 2019.  The meeting continued the false good-news reporting that had taken place in prior months.  For example, the company showed a slide which stated:

"Post-Combination, McDermott is a fundamentally different and much larger company as compared to where we were in 2017, with significant earnings potential."

24.  The slide showed dramatic increase in revenues, backlog and order intake from the prior year.

25.  At no time during the meeting were plaintiff or the investing public informed of the significant losses being accrued by the company's Cameron LNG project.  In furtherance of the scheme or through negligence, these losses were not discussed during the meeting by the defendants or in any report, slide or presentation given during the meeting.

26.  In July, 2019, just two months after the company's annual meeting, the Securities and Exchange Commission ('SEC') sent McDermott a letter, accompanied by subpoenas, notifying the company that it was under investigation for failing to properly disclose projected losses on its Cameron LNG project. Although the investigation was highly material, the defendants, in concert with one another and in furtherance of the scheme or through negligence, did not disclose the investigation to plaintiff or the investing public.

27.  In July, 2019, McDermott undertook a study (the "Financing Case") the purpose of which was to consider its options, including declaring bankruptcy, as the result of the massive losses being incurred at the Cameron and Freeport projects which were draining the company's cash and impacting its loan covenants. The defendants, in concert with one another and in furtherance of the scheme or through negligence, did not disclose this highly material study or the mounting Cameron and Freeport losses to the plaintiff or the investing public.

28.  The "Financing Case" was undertaken because McDermott was being forced by the SEC investigation to start recognizing and reporting the huge losses that had been accruing on the Cameron LNG project.

29.  On July 29, 2019, in order to placate and fend off the SEC, McDermott released its second quarter 2019 results which unexpectedly showed the company lost $146 million during second quarter 2019 versus a net income of $47 million during the prior year period.  The second quarter 2019 report was published on McDermott's website and was read by plaintiff on or about July 29, 2019.  In addition, the company reduced its full year guidance which now predicted the company would **lose** $1.65 per share instead of making $.90 a share in 2019, a negative swing of $2.55 a share from the first quarter, 2019, guidance.  The losses and reduced earnings projections were the result of the recognition of past and present Cameron (and to a lesser extent, Freeport) losses which had been known by the defendants but not previously reported, as noted herein.

30.  On July 29, 2019, the defendants, acting in concert with one another and in furtherance of the scheme or through negligence, issued a statement (as part of the second quarter, 2019, report) on McDermott's website, read by the plaintiff on or about July 29, 2019, that operating income was going to achieve a "sharp improvement" during the fourth quarter of 2019.  The company's anticipated

improvement was therefore shifted by the defendants from second-half 2019 to fourth quarter 2019.

31. In the statement, defendant Dickson, acting in concert with the other defendants and in furtherance of the scheme or through negligence, omitted material information that McDermott faced significant difficulty in the months ahead, including impending earnings, cash flow, loan covenant and potential bankruptcy problems. To the contrary, defendant Dickson stated that:

"Although the company reported mixed results for the second quarter of 2019, we are encouraged by the record-setting level of backlog and new awards. We are also pleased with the visibility we have into expected 2020 revenues, of which $7.4 billion was already in backlog as of the end of the second quarter of 2019. This is well above the $4.2 billion of 2019 revenues we had in backlog this time last year. This strong market posture continues to demonstrate the benefits of our combination with CB&I and the opportunities available in a strong market environment. McDermott has booked more than $19 billion of awards since the May 2018 combination with CB&I, demonstrating continued customer confidence and healthy end markets. Importantly, as of the end of the second quarter of 2019, legacy CB&I projects represented only about 14% of the current backlog. All the awards we've won since the combination were booked under McDermott's stringent risk management protocols, which we believe pave the way for us to deliver consistent margin performance through the application of the One McDermott Way in the execution of this backlog. The company continues to remain on schedule executing the Cameron and Freeport LNG projects. The Cameron settlement agreement we signed earlier this month is a testament to the mutually productive relationship we have built with this customer since the combination – and the associated incentives provided a meaningful contribution to our second quarter results."

"...we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020."

"Looking ahead, our revenue opportunity pipeline remains near a historic high and, more specifically, we are seeing steady upward momentum in a number of key

areas. For example, in the strategic area of front end engineering design (FEED), our awards through the first half of 2019 are already more than double what we won in all of 2018 – in terms of both man-hours and dollar value – and that's especially important as FEED work positions us for EPC opportunities. This year we have booked $1.5 billion of EPC work as a result of FEED work that's been done since the combination. Further, in our Technology business, we are forecasting the number of license sales to increase by 25% this year versus 2018. One of the recent highlights was our selection as the Master Licensor by S-OIL, an affiliate of Saudi Aramco, in support of its ethylene cracker and downstream petrochemicals complex, being developed as a major expansion of S-OIL's existing refinery in South Korea. Our Technology business gives us unparalleled insight into upcoming EPC opportunities, and we see roughly $40 billion of potential EPC pull-through opportunities in the refining and petrochemical markets over the next five years. We believe the petrochemical market, in particular, is poised for another wave of investment in the next 12 to 24 months, with world ethylene capacity expected to increase by more than 40% between 2019 and 2028."

32.   Nowhere in their statement did the defendants alert plaintiff or the investing public to the fact that McDermott had already begun a material analysis (the "Financing Case") designed to consider a change in the capital structure of the company, including bankruptcy, as discussed herein.  And nowhere in the July 29, 2019, second quarter report did the defendants alert plaintiff or the investing public to the material fact that they were aware that the Cameron LNG project, and other legacy projects as well, were going to continue experiencing substantial losses in the months ahead which would cause the company to incur huge losses, a cash flow drain and loan covenant problems.

33.   On August 2, 2019, after having read the defendants' false representations mentioned herein, and not being aware of the defendants' material omissions, plaintiff became convinced that the share price decline that resulted

from the second quarter loss was a buying opportunity given the defendants'

projections for substantial earnings improvement in the fourth quarter of 2019.

Plaintiff, relying on the defendants' false representations, accordingly purchased

22,000 shares of McDermott International common stock at a combined cost of

$139,322.28. Had the defendants disclosed the material information that the

company was going to continue experiencing massive losses at its Cameron and

Freeport facilities, that the company was in dire need of working capital, that it had

or was about to violate its loan covenants, that it had undertaken a study (the

Financing Case) to stave off bankruptcy, that bankruptcy was a very real

possibility in the near term and that the company was under SEC investigation for

failing to properly disclose projected losses and had the defendants not

intentionally materially overstated the company's projected results as discussed

herein, plaintiff would not have purchased or held the stock.

34. The Financing Case analysis was concluded on or about September 16,

2019, and the company immediately made the decision to declare Chapter 11

bankruptcy. (At the company's Chapter 11 bankruptcy plan confirmation hearing

in the U.S. District Court for the Southern District of Texas, Southern Division, on

March 12, 2020, John R. Castellano, Chief Transformation Officer for McDermott

and a company insider with intimate knowledge of the decision-making process,

testified that the company decided in mid-September, 2019, to declare Chapter 11

bankruptcy.)  The decision to declare bankruptcy was made just seven weeks after the defendants' July 29, 2019, effusive second quarter comments, including defendant Dickson's comment that

*"...we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020."*

It is unbelievable that the defendants were not aware of the massive difficulty the company was in when they, in concert with one another and in furtherance of the scheme or through negligence, made their July 29, 2019, statement that the company was doing great and operating income would see a "sharp  improvement" by the fourth quarter of 2019.

35.  The defendants, acting in concert and in furtherance of the scheme or through negligence, failed to inform plaintiff or the investing public in mid-September, 2019, that the decision had been made to declare bankruptcy. However, rumors began to fly and the company's share price declined from $6.08 on September 16, 2019, immediately before the rumors, to $2.16 on September 18, 2019, after the rumors came out.

36.  On September 18, 2019, in order to stem the share price decline, the defendants, acting in concert and in furtherance of the scheme or through negligence, issued a terse press release (read by plaintiff on or about September 18, 2019) stating that:

"McDermott International, Inc., routinely hires external advisors to evaluate opportunities for the Company. The Company is taking positive and proactive measures, as we have done in the past, intended to improve its capital structure and the long-term health of its balance sheet."

37. The defendants, acting in concert and in furtherance of the scheme or through negligence, made no mention in their press release of the highly material fact that the company had already decided to declare bankruptcy. Instead, they attempted to deceive the plaintiff and the investing public that everything that was happening at the company was "routine". The defendants, acting in concert and in furtherance of the scheme or through negligence, dismissed the prospect of a bankruptcy filing as "rumor or speculation" in subsequent communications with plaintiff and the investing public even though they were aware that the company had already decided to file for Chapter 11.

38. On September 20, 2019, the defendants, acting in concert and in furtherance of the scheme or through negligence, issued a press release (read by plaintiff on or about September 20, 2019) stating that the company had hired Evercore to help it sell its Lummus Technology division in order to strengthen the company's balance sheet. **The press release made no mention of the highly material fact that the company had already decided to declare bankruptcy.** The defendants and their agents have subsequently testified that there was never a plan for the out-of-court sale of Lummus Technology to strengthen McDermott's balance sheet.

39.  The press release sets forth, in part, as follows:

"HOUSTON, Sept. 20, 2019 /PRNewswire/ -- McDermott International, Inc.
(NYSE: MDR) today *announced it recently received unsolicited approaches to
acquire all or part of Lummus Technology, McDermott's industry-leading
technology business, with valuation exceeding $2.5 billion. Based on the receipt of
these approaches, McDermott is exploring strategic alternatives to unlock the
value of Lummus Technology while maintaining the strategic rationale of
engineering, procurement and construction (EPC) pull-through.* [Emphasis
added.]

McDermott's Lummus Technology is a leading licensor of proprietary
petrochemicals, refining, gasification and gas processing technologies, and a
supplier of proprietary catalysts and related engineering. With a heritage spanning
more than 100 years, encompassing approximately 3,100 patents and patent
applications, Lummus Technology provides one of the industry's most diversified
technology portfolios to the hydrocarbon processing sector.

'Lummus is an excellent business, with incredibly impressive employees, that has
earned a reputation for expertise, innovation and reliability in the refining and
petrochemical industries,' said David Dickson, President and Chief Executive
Officer of McDermott. *"The process of exploring strategic alternatives is part of
our ongoing efforts intended to improve McDermott's capital structure, and we
plan to use the proceeds from any transaction involving Lummus Technology to
strengthen our balance sheet. While Lummus is an important business within
McDermott, we have decided to undertake a process to fully realize its strategic
and financial value."* [Emphasis added.]

Separately, McDermott's previously announced processes to sell the remaining
portion of its pipe fabrication business and its industrial storage tank business are
ongoing."

40.  This disclosure regarding the unsolicited approaches to acquire Lummus

and that McDermott would use the proceeds from any Lummus transaction to

strengthen its balance sheet was well received by the market.  Zephirin Group

analyst Lenny Zephirin said the offer is "salivating" and, if accepted, should allow

the company to reduce leverage by about $1.2 billion. See A. Sarkar, "McDermott

International gets takeover interest for its Lummus Technology unit", Reuters,

Sept. 20, 2019, available at https://www.reuters.com/article/us-mcdermott-

international-strategic-alt/mcdermott-international-gets-takeover-interest-for-its-

lummus-technology-unit-idUSKBN1W51AC.  Credit Suisse analysts, who called

Lummus the "crown jewel" of McDermott, said the valuation is reasonable given

historic transactions in the space, and that the deal could happen in early 2020. Id.

Following the disclosure, the price for McDermott common stock spiked 50% in

premarket trading on September 20 and closed at $2.01 per share, up 27.22%.

41. The September 20 press release and Defendant Dickson's statements

therein, however, were materially misleading. There was not any near-term plan

for a Lummus transaction to strengthen the company's balance sheet. The

statements were merely part of the defendants' scheme to artificially inflate the

price of McDermott common stock while providing the company time to develop

and execute on a prepackaged Chapter 11 restructuring plan **which it was already**

**working on.**

42. John R. Castellano, AlixPartners Managing Director and Chief

Transformation Officer for McDermott, in testimony before the bankruptcy court

during the March 12, 2020, bankruptcy hearing *stated that when he began working*

*with defendants, McDermott, and their advisors **in September 2019**, the objective*

*was to negotiate a consensual Chapter 11 reorganization as this was the only*

*viable option McDermott had.* [Emphasis added.]

43.  Mr. Castellano also testified during the March 12, 2020, bankruptcy

hearing that [at least] one of the "unsolicited" approaches to purchase Lummas

actually came from a company controlled by a McDermott International insider.

This raises the possibility that the company's claim that it got miracle, last-minute,

'unsolicited' offers to buy Lummus "out of the blue" was a sham.

44. In his Declaration in Support of Chapter 11 Petitions, Defendant Dickson

confirmed his contemporary September, 2019, knowledge of the acute liquidity

crisis:

"In late September 2019, we were running out of cash. It became clear that despite
McDermott's improvements and success winning projects, the company remained
over-leveraged and could not continue running its business and servicing its debt."
(Dickson Decl.)

45.Thus, the defendants knew that the statements in the September 20 press

release were materially false and/or misleading when made, but nonetheless

approved them for public distribution. These statements had the principal purpose

to calm plaintiff and the investing public as well as McDermott's agitated vendor

base.

46.  On October 21, 2019, McDermott, with the prior knowledge and at the

direction of the defendants in concert and in furtherance of the scheme or through

negligence, issued a press release (read by plaintiff on or about October 21, 2019) that it had secured financing of $1.7 billion, subject to certain terms, that the company would use to finance working capital and support the issuance of required performance guarantees on new projects. The tone and tenor of the press release was that the company's liquidity problems had been solved. Nowhere in the press release was the possibility of bankruptcy even raised, even though the company had decided in mid-September to declare bankruptcy. The press release included a statement from defendant Dickson, McDermott President and CEO, that:

"This new credit agreement is a continued signal from our lenders that they support McDermott, our underlying business growth strategy and ability to achieve a long-term balance sheet solution. The Agreement provides near-term liquidity for the Company to manage working capital and provide performance guarantees on expected new awards. We remain focused on serving our customers' needs, supporting our dedicated employees and maintaining our valued relationships with our subcontractors, suppliers and other business counterparties, all as part of our efforts to enhance our position as a premier, fully integrated provider to technology, engineering and construction solutions to the energy industry."

47. The press release reiterated McDermott's plan to sell Lummus Technology: "McDermott continues to pursue the previously announced strategic alternatives process for Lummus Technology".

48. The press release also announced that McDermott had withdrawn its previously stated guidance for full-year 2019. The defendants, acting in concert and in furtherance of the scheme or through negligence, gave no new guidance for

full-year 2019 earnings. Nowhere in the press release, written by the defendants, acting in concert and in furtherance of the scheme or through negligence, were the highly material facts that McDermott had already decided to declare bankruptcy or that it was going to report massive losses for the remainder of the year and for full-year 2019.

49. On October 22, 2019, just one day after the October 21, 2019, press release, McDermott and AP Services, an affiliate of AlixPartners, entered into an agreement (the "October 22 Agreement") that replaced a September 17, 2019, agreement between McDermott and AlixPartners, wherein AP Services agreed "to provide temporary personnel to McDermott to assist in a contemplated financial restructuring." Bankr. Proc. ECF No. 916 at 1 (¶1). Among other things, **the October 22 Agreement provided for the payment of a $5 million success fee that would be earned upon the completion of a restructuring through confirmation of a Chapter 11 plan of reorganization**. Bankr. Proc. ECF 434-1.

50. Even though the October 22 Agreement was highly material, the defendants, in concert and in furtherance of the scheme or through negligence, did not report it to plaintiff or the investing public in order to keep McDermott's share price at an artificially high level.

51. **Just two weeks after the October 21, 2019, press release, November 4, 2019, McDermott released its third quarter results in which it reported a net loss of $1.887 billion, or $10.37 per share**.

52. Prior to the third quarter report, the defendants, acting in concert and in furtherance of the scheme or through negligence, had not made any announcement to plaintiff or the investing public that the third quarter results were going to substantially deviate from what had been projected. As noted herein, on October 21, 2019, defendants, acting in concert and in furtherance of the scheme or through negligence, issued a press release (read by plaintiff on or about October 21, 2019) which, among other things, withdrew the company's full-year, 2019, guidance without updating said guidance even though the defendants, acting in concert and in furtherance of the scheme or through negligence, had forecast a "sharp improvement" for the fourth quarter just weeks earlier.

53. On the same day, November 4, 2019, McDermott filed its Form 10-Q (for the third quarter, 2019) in which it disclosed for the first time that it was being investigated by the SEC. Plaintiff read the 10-Q on or about November 5, 2019. Significantly, McDermott was notified by the SEC in July 2019 (by a letter dated July 26, 2019 together with an accompanying subpoena) that it was conducting an investigation related to disclosures made by the company concerning the reporting of projected losses associated with the Cameron LNG project.

54. At no prior time did the defendants or the company disclose to the plaintiff or the investing public the existence of the SEC's investigation. The defendants, acting in concert an in furtherance of the scheme or through negligence, kept the plaintiff and the investing public in the dark about the material SEC investigation for over three months, from July 26, 2019, to November 4, 2019.

55. The November 4, 2019, 10-Q for the first time described a Chapter 11 filing as a risk McDermott *might* face. This statement was materially false and misleading when made because, as described above, the defendants, McDermott, and their advisors had already begun preparing a Chapter 11 bankruptcy plan starting in late September, 2019. In other words, there was no *might* at all. There was a *will*. A McDermott Chapter 11 filing was certain, not just possible.

56. On November 4, 2019, the day of the third quarter earnings announcement, McDermott reported that defendant Stuart Spence, the company's Chief Financial Officer whose compensation was $3.6 million in 2018 (largely the result of stock grants) had resigned "to pursue other opportunities". Mr. Spence's resignation date was actually November 4, 2019, the date of the disastrous third quarter earnings announcement. As discussed above, defendant Spence was already the defendant in litigation against him, defendant Dickson and McDermott

which, among other things, accused him of making false and misleading statements relating to McDermott's finances.

57. Defendant Spence also received a severance payment of $866,000.00 and other benefits from McDermott in return for his release of all claims against McDermott and its employees and agents, **including any such matter arising from the negligence, gross negligence or reckless, willful or wanton misconduct of any of the Releasees.**

58. The release does not include any claims for indemnification for suits filed against Defendant Spence by outside parties during his tenure at McDermott.

59. The release has a non-disparagement agreement:

"Employee shall refrain from making, directly or indirectly, in any public or private communication (whether oral, written or electronic), any criticisms or negative or disparaging comments or other statements about the Company or any of the other Releasees, or about any aspect of the respective businesses, operations, financial results or prospects of any of the Company Entities, including comments relating to Employee's termination of employment. Notwithstanding the foregoing, it is understood and agreed that nothing in this Section 4(b) or in Section 5 hereof is intended to: (i) prevent Employee from testifying truthfully in any legal proceeding brought by any governmental authority or other third party or interfere with any obligation Employee may have to cooperate with or provide information to any government agency or commission, subject to compliance with the provisions of Section 5(c) hereof, if applicable; (ii) prevent Employee from advising Employee's spouse of the terms and conditions of this Agreement; or (iii) prevent Employee from consulting with Employee's own legal counsel, as contemplated by Section 7 of this Agreement."

60. Most importantly, the release has a non-disclosure agreement

prohibiting defendant Spence from disclosing any information to McDermott

analysts or shareholders:

" *Employee will not disclose any of the Confidential Information to any securities
analysts, shareholders, prospective investors*, customers, competitors or any other
third party, including any third party who has or may express an interest in
acquiring any of the Company Entities or all or any significant portion of their
respective outstanding equity securities or assets. If Employee is legally required to
disclose any Confidential Information, Employee shall, to the extent not prohibited
by applicable law or legal process, promptly notify the Company in writing of such
requirement so that the Company or any of the other Company Entities may seek
an appropriate protective order or other relief or waive compliance with the
nondisclosure provisions of this Section 5 with respect to such Confidential
Information. To the extent not prohibited by applicable law, Employee agrees to
cooperate with and not to oppose any effort by the Company or any other
Company Entity to resist or narrow such request or to seek a protective order or
other appropriate remedy. In any such case, Employee will: (i) disclose only that
portion of the Confidential Information that, according to written advice of
Employee's counsel, is required to be disclosed; (ii) use reasonable best efforts to
obtain assurances that such Confidential Information will be treated confidentially;
and (iii) to the extent not prohibited by applicable law, promptly notify the
Company in writing of the items of Confidential Information so disclosed."

61. Defendant Spence may have to pay back McDermott for any payments

made to him if he breaches the agreement or even if a court or arbitrator finds it

invalid or unenforceable:

"Employee agrees that in the event that (i) Employee breaches any term of Sections
3 or 4 hereof or this Section 5, or (ii) Employee challenges the validity of all or any
part of this Section 5, and all or any part of this Section 5 is found invalid or
unenforceable for any reason whatsoever by a court of competent jurisdiction or an
arbitrator in a proceeding between Employee and a Company Entity, in addition to
any other remedies at law or in equity the Company may have available to it, the
Company shall not be obligated to make any of the payments and may cease to
make such payments or to provide for any of the benefits specified in Section 2

hereof, and shall be entitled to recoup from Employee any and all of the value of the payments and benefits provided pursuant to Section 2 hereof that have vested or been paid pursuant to that Section."

62.  It can be inferred from the above that McDermott did not want the details of its financial operations and outlook to become public and that defendant Spence may have known something that McDermott was paying him not to discuss.

63.  On December 2, 2019, the defendants, acting in concert and in furtherance of the scheme or through negligence, wrote and issued a press release titled *McDermott to Access $350 Million Tranche B Financing Under Superpriority Senior Secured Credit Facility.*  The press release stated that McDermott was granted access to the second tranche of funding (Tranche B) under the superpriority senior secured credit agreement (SSSCA), whereby the company received a $250 million Term Loan Facility and a $100 million Letter of Credit Facility.  The press release, read by plaintiff on or about December 2, 2019, stated that McDermott would use the proceeds "to continue financing working capital and support the issuance of required performance guarantees on new projects."  In the press release, the defendants also reiterated the company's continued pursuit of "the previously announced strategic alternatives process for Lummus ...." Id.

64.  The December 2, 2019, press release, however, was materially false and misleading when made because, as the following declaration of John Castellano to

the bankruptcy court shows, it failed to disclose the material fact that the

company's secured lenders would not provide any further liquidity under the

SSSCA to fund business operations, and that the sale of Lummus would be

consummated only as part of a Chapter 11 process:

"On December 1, 2019, after significant deliberation and discussion with the
secured lenders on whether to fund the second tranche under a debtor-in-
possession financing facility rather than on an out-of-court basis, McDermott
gained access to the second tranche of funding under the Superpriority Facility
providing an incremental $250 million term loan facility ($229 million after fees)
and a $100 million letter of credit facility. ***In connection with this funding, the
secured lenders stated that they did not expect to fund any additional amounts on
an out-of-court basis. As such, McDermott's liquidity would drive the timing of
any potential chapter 11 filing.***

***McDermott told prospective purchasers of [Lummus] that the purchase was to be
consummated as part of a chapter 11 process, and provided clear milestones for
the marketing process with the aim of achieving a signed "stalking horse"
purchaser by the time McDermott would need to seek chapter 11 relief."***
Castellano Decl.

Mr. Castellano subsequently stated to the bankruptcy court:

"McDermott enters chapter 11 with a massively consensual prepackaged
restructuring." "Getting here has been an all-out sprint for the company and its
many stakeholders around the globe." ***"Since September 2019, McDermott has....
marketed and achieved a signed stalking-horse purchaser for the sale of
[Lummus]"***. Castellano Decl.

65. Between November 8, 2019, and December 26, 2019, plaintiff

purchased an additional 8,000 shares of McDermott International shares at a total

cost of $7219. Had the defendants disclosed the material information that the

company was going to continue experiencing massive losses at its Cameron and

Freeport facilities, that the company was in dire need of working capital, that it had

or was about to violate its loan covenants, that the company was actively pursuing

and finalizing a bankruptcy filing and had the defendants not intentionally

materially overstated the company's projected results (see above), plaintiff would

not have purchased or held the stock.

66. McDermott did not release fourth quarter 2019 results. However,

McDermott advisors Evercore, Kirkland & Ellis and AlixPartners estimated that

McDermott experienced a fourth quarter operating loss of $141 million, or

approximately $.77 per share, even though the defendants had been saying as late

as July 29, 2019, (second quarter 2019 earnings release) that operating income was

going to achieve a "**sharp improvement**" during the fourth quarter of 2019.

67. On January 21, 2020, McDermott formerly announced that it was filing

a Prepackaged Chapter 11 proceeding in the United States Bankruptcy Court for

the Southern District of Texas (Case number 20-30336). As part of the filing, the

company announced that it was proposing that all of the existing outstanding

shares of McDermott would be cancelled (declared worthless).

68. Prior to the January 21, 2020, announcement, the defendants, acting in

concert and in furtherance of the scheme or through negligence, had made no

announcements to plaintiff or the investing public that the company was even

considering bankruptcy or that it had decided to declare bankruptcy in mid-

September, 2019. Throughout the entirety of 2019 and up until the January 21, 2020, bankruptcy announcement, the defendants, acting in concert and in furtherance of the scheme or through negligence, produced and published a continuous stream of positive press releases, read by plaintiff, touting the continued and unparalleled success of the company and its operations. **Not one press release informed plaintiff or the investing public of the present or future difficulties the company was experiencing or of the company's decision to declare bankruptcy in mid-September, 2019. Indeed, to the contrary, at all times relevant, McDermott continually inundated plaintiff and the investing public with nothing but feel-good, good news press releases falsely touting the company's results, financial condition and outlook.** These press releases can be found here:

https://www.mcdermott-investors.com/news/default.aspx

69. Just prior to the January 21, 2020, bankruptcy announcement, McDermott shares were trading at $.70 per share. After the January 21, 2020, announcement, McDermott's share price fell to a low of $.01 per share. The shares have since been cancelled and are now worthless.

70. Part of McDermott's bankruptcy Plan filed with the court called for the issuance of new common stock. The Management Incentive Plan included in the company's bankruptcy Plan calls for the reservation of 7.5% of the new stock to be

used in grants to McDermott management and the company's Board of Directors. Assuming the number of pre-bankruptcy shares outstanding (193 million), a conservative post-bankruptcy share price of $25 and 10% of the post-bankruptcy 7.5% insider share allotment goes to defendant Dickson, defendant Dixon stands to gain over $36,000,000 from a McDermott bankruptcy (193,000,000 x $25 x .10 x .075 = $36,187,000), not including his annual salary.

## DEFENDANTS' DUTY TO DISCLOSE

71. Plaintiff alleges that he was directly harmed by the actions of the defendants as described herein. (Plaintiff also alleges that the actions of the defendants as described herein did not deplete the assets of the bankruptcy estate.) The defendants had a duty to disclose material facts and omissions to the plaintiff because:

A. The defendants, especially defendants Dickson and Spencer, had a special fiduciary relationship with the plaintiff. (See esp. paragraph 83 below.)

B. The defendants voluntarily disclosed partial information to the plaintiff, but knowingly failed to disclose the whole truth, as seen herein.

C. The defendants made representations to plaintiff but knowingly failed to disclose new information that made the earlier representations misleading or untrue, as seen herein.

D. The defendants made partial disclosures to plaintiff which conveyed a false impression, as seen herein.

## SCIENTER ALLEGATIONS

(NOTE: As noted above, this is a state law cause of action that was filed in state court but removed to Federal Court by the defendants. This Plaintiff's First Amended Petition is also a state law cause of action which has been filed in response to the (Federal Bankruptcy) Court's instruction on March 10, 2021, to file an amended petition containing only state law claims as preparatory to having this case remanded to state court. Although a plaintiff is not required to plead Scienter in a state law cause of action, plaintiff has done so herein in an abundance of caution.)

72. As alleged herein, defendants acted with scienter because they knew that the public documents and statements they issued and/or disseminated in the name of McDermott were materially false and/or misleading or failed to disclose (omitted) material facts to make them not misleading and they knew that such documents or statements would be issued or disseminated to the plaintiff and the investing public. The defendants participated in the scheme to fool plaintiff and the investing public into continuing to purchase and hold McDermott International shares by making material misrepresentations and omissions so that the defendants

would benefit by having their own holdings of McDermott International shares remain at inflated levels they would not have been at had the material misrepresentations and omissions not been made.

73. Defendants, as the individuals that created, signed, were quoted in, or orally made the allegedly false and misleading statements described herein were obligated to familiarize themselves with the subject matter of those public statements and to speak truthfully. The defendants violated such obligations.

74. Defendants, as the individuals that certified filings made to the SEC filing pursuant to Exchange Act Rules 13a-14(a)/15d-14(a) and Section 906 of the Sarbanes-Oxley Act of 2002, were obligated to inquire and investigate, familiarize themselves with the subject matter underlying their certifications, and reassure themselves that the matters they were certifying were accurate and that McDermott was speaking truthfully when it made such disclosures.  The defendants violated such obligations.

75. The statements of defendants and their agents evidencing that there was never a plan for the out-of-court sale of Lummus to strengthen McDermott's balance sheet demonstrate strong evidence of conscious misbehavior or recklessness.  Motive and opportunity are also evident.

76. As detailed above, defendants had significant personal financial motivations, unique to them, to engage in the misconduct alleged herein.

77. Defendants were motivated by their compensation packages, retention bonuses, and continued employment and took affirmative actions to protect their financial interests including when they denied that a bankruptcy was forthcoming even after the company had already decided to pursue Chapter 11.

78. Defendants' scienter was further demonstrated when they, in concert and in furtherance of the scheme or through negligence, gave clear guidance that the proposed Lummus sale process was proceeding when, in fact, defendants and their advisers had previously concluded that there was no way of avoiding bankruptcy and Lummus would be sold only as part of a bankruptcy.

79. In addition, as seen herein, the Management Incentive Plan in the Plan of Reorganization leaves management with a significant equity stake even as common stockholders' interests are eliminated.

80. The company's public filings with the SEC that attempt to conceal or otherwise obfuscate defendants' fraudulent conduct are also highly probative of scienter. For example, defendants' repeated assertions that the (out-of-court) sale process for Lummus was ongoing is highly probative of scienter; as are defendants' dismissals of the prospect of a Chapter 11 filing as rumor or speculation.

81. Even further, the fraud alleged herein implicates the core operations of McDermott, since its acute liquidity crisis threatened the company's very existence

as an ongoing concern. In light of these facts and their day-to-day involvement in the development of a prepackaged Chapter 11 Plan of Reorganization, it is inconceivable that defendants did not have actual access to information contradicting the statements made in the company's name regarding the sale process for Lummus and the prospect of bankruptcy. Such knowledge is imputable to defendants given the implication of core operations and the defendants' roles and status within the company.

82. Defendants' flagrant violation of express corporate policy further buttresses the inference of defendants' scienter, whether based on their knowledge or their recklessness.

83. McDermott's Code of Ethics for Chief Executive Officer and Senior Financial Officers (the "Code"), applies to both defendants Dickson and Spencer. The Code is available at

http://s22.q4cdn.com/787409078/files/doc_downloads/governance_documents/CG -Code-of-Ethics-for-CEO-SFOs.pdf

Pursuant to the Code:

**"Full and fair disclosure.** It is the Company's policy that the information in its public communications, including filings with the Securities and Exchange Commission, be timely and understandable and fair, complete and accurate in all material respects. Covered Employees should exercise diligence and care to do their part in acting in furtherance of this policy. ***Covered Employees are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the Company to anyone having a role in the Company's financial reporting and disclosure processes***. Covered Employees must not directly or indirectly take any action to coerce, manipulate, mislead or

fraudulently influence the Company's or its subsidiaries' independent auditors or any internal accounting or auditing personnel for the purpose or with the effect of rendering the Company's financial statements misleading, or direct anyone else to do so.

It is the responsibility of each Covered Employee promptly to bring to the attention of the Company's Disclosure Committee any material information of which the executive may become aware that affects the disclosures made by the Company in its public filings or otherwise, and otherwise to assist the Disclosure Committee in fulfilling its responsibilities. In addition, *each Covered Employee shall promptly bring to the attention of the Disclosure Committee any information the employee may have concerning* (a) significant deficiencies or material weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial information or (b) *any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls*.

...

**Reporting of violations of this code.** *Each Covered Employee is responsible for reporting any violation of this Code of Ethics, or circumstances which the Covered Employee considers to involve a probable violation, to the Compliance Officer identified below*. Employees may choose to remain anonymous in reporting violations or circumstances that may involve a violation.

**Accountability.** *Each Covered Employee will be held accountable for his or her adherence to this Code of Ethics*. The failure to observe the terms of this Code of Ethics may result in disciplinary action, up to and including termination of employment. *Violations of this Code of Ethics may also constitute violations of law that may result in civil and criminal penalties*."

84.  As seen herein, defendant Spencer's non-disclosure agreement, made by him upon his separation from the company in exchange for a payment of $866,000.00, included a promise not to disclose any information "to any securities analysts, shareholders, prospective investors, .......".  This, as well as the other promises he made in his termination agreement, is highly indicative of scienter.

## COUNT 1
## COMMON LAW FRAUD

85.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86.  The defendants made or caused to be made material representations to the plaintiff about McDermott International, its performance and its financial condition which were false, inaccurate or misleading.

87.  When the defendants made the representations to the plaintiff, they knew the representations were false or they made the representations recklessly, as positive assertions, and without knowledge of their truth.

88.  The defendants made the representations with the intent that the plaintiff would act on them.

89.  The plaintiff acted on the representations.

90.  The defendants agreed upon and operated a scheme ("the scheme") to artificially inflate McDermott's share price by not disclosing the company's financial condition and outlook, including, but not limited to, material current and projected losses from the Cameron and Freeport projects and elsewhere and the company's impending bankruptcy, to plaintiff.  The defendants participated in the scheme to fool plaintiff into continuing to purchase and hold McDermott International shares by making material misrepresentations and omissions so that the defendants would benefit by having their own holdings of McDermott

International shares remain at inflated levels they would not have been at had the material misrepresentations and omissions not been made.

91. The defendants failed to disclose the material facts necessary to make the statements they and their representatives made, in light of the circumstances under which they were made, not misleading.

92. The defendants did not have a reasonable basis for their alleged false statements and omissions and engaged in practices and a course of business that operated as a fraud and deceit upon plaintiff.

93. The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct (the scheme) to conceal adverse material information about McDermott International, including, but not limited to, its actual (poor) present financial condition, its projected large earnings losses and its impending bankruptcy filing.

94. The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal the fact that the company, including its Cameron LNG and Freeport LNG operations, were experiencing and were projected to experience large losses.

95. The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal the fact that the company was contemplating bankruptcy, that a bankruptcy filing was imminent and that the company had made the decision to file for bankruptcy.

96. Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the true status of McDermott's financial condition and outlook in order to maintain McDermott's share price at an artificially high, inflated, level it would not have been at had the material misrepresentations and omissions not been made.

97. The defendants and their representatives, with prior knowledge and approval of the defendants, made the misrepresentations and omissions of material facts set forth herein with the intent to induce the plaintiff to rely on such misrepresentations and omissions of material fact.

98. Plaintiff reasonably relied on the defendants' misrepresentations and omissions of material facts in connection with his purchases and retention of McDermott International common stock. Plaintiff relied on these statements both directly to the extent they were personally made to plaintiff and indirectly to the extent they artificially inflated the market price. But for the defendants'

representations (wrongful conduct), plaintiff would not have purchased and retained (held) his McDermott International stock.

99.  Plaintiff alleges that he was directly harmed by the actions of the defendants as described herein.  Plaintiff further alleges that the actions of the defendants as described herein did not deplete the assets of the bankruptcy estate.

100.  As a direct and proximate result of defendants' representations (wrongful conduct), plaintiff suffered damages in connection with his purchases and his retention (holding) of McDermott International common stock in excess of the jurisdictional limits of this Court.

101.  Pursuant to Section 41.003 of the Texas Civil Practice and Remedies Code, plaintiff is entitled to recover exemplary damages in an amount to be determined by the trier of fact.

## COUNT 2
## NEGLIGENT MISREPRESENTATION

102.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

103.  The defendants made representations to plaintiff in the course of their business or in transactions in which they had pecuniary interests.

104.  The defendants supplied false information for the guidance of plaintiff in their business.

105.  The defendants did not exercise reasonable care or competence in obtaining or communicating the information.

106.  The Plaintiff justifiably relied on the defendants' representations.

107.  The defendants negligently made false and misleading representations to the plaintiff and failed to disclose material facts to the plaintiff.

108.  The defendants made these negligent misrepresentations and omissions of material fact to plaintiff for the purpose of inducing plaintiff to rely on such misrepresentations and omissions of material fact to purchase and/or to retain (hold) McDermott International common stock.

109.  Plaintiff justifiably relied on the defendants' misrepresentations and omissions of material fact in purchasing and retaining his McDermott International common stock.

110.  Plaintiff would not have purchased or retained McDermott International stock if plaintiff had been provided accurate and not misleading information by the defendants about the company, its outlook, its financial condition and the defendants' plan to take the company into bankruptcy.

111.  Plaintiff alleges that he was directly harmed by the actions of the defendants as described herein.  Plaintiff further alleges that the actions of the defendants as described herein did not deplete the assets of the bankruptcy estate.

112.  The defendants' negligent misrepresentations proximately caused the plaintiff's injuries.  Plaintiff suffered material pecuniary loss by justifiably relying on the representations of the defendants.

113.  As a direct and proximate result of the defendants' misrepresentations and omissions of material fact, plaintiff suffered damages in connection with his purchase and/or retention (holding) of McDermott International common stock in excess of the jurisdictional limits of this Court.

## DISCOVERY RULE AND FRAUDULENT CONCEALMENT

114.  Plaintiff asserts all applicable state statutory, common law and contractual rights and theories related to the tolling and/or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule, and/or fraudulent concealment.

## JURY DEMAND

115.  Plaintiff demands a trial by jury on all issues so triable.

## PRAYER

WHEREFORE, Plaintiff prays that defendants be cited to appear herein and, after a trial on the merits, that the Court enter judgment awarding plaintiff the following:

1. actual damages;

2. exemplary damages;

3. costs;

4. pre-judgment and post-judgment interest as allowed by law; and

5. all such other and further relief, both general and special, at equity and at law, to which plaintiff may be justly entitled.


Respectfully submitted,


/s/ Michael Van Deelen
Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com
Plaintiff

This page intentionally left blank.