*with defendants, McDermott, and their advisors **in September 2019**, the objective*

*was to negotiate a consensual Chapter 11 reorganization as this was the only*

*viable option McDermott had.*  [Emphasis added.]

43.  Mr. Castellano also testified during the March 12, 2020, bankruptcy

hearing that [at least] one of the "unsolicited" approaches to purchase Lummas

actually came from a company controlled by a McDermott International insider.

This raises the possibility that the company's claim that it got miracle, last-minute,

'unsolicited' offers to buy Lummus "out of the blue" was a sham.

44. In his Declaration in Support of Chapter 11 Petitions, Defendant Dickson

confirmed his contemporary September, 2019, knowledge of the acute liquidity

crisis:

"In late September 2019, we were running out of cash. It became clear that despite
McDermott's improvements and success winning projects, the company remained
over-leveraged and could not continue running its business and servicing its debt."
(Dickson Decl.)

45.Thus, the defendants knew that the statements in the September 20 press

release were materially false and/or misleading when made, but nonetheless

approved them for public distribution. These statements had the principal purpose

to calm plaintiff and the investing public as well as McDermott's agitated vendor

base.

46.  On October 21, 2019, McDermott, with the prior knowledge and at the

direction of the defendants in concert and in furtherance of the scheme or through

negligence, issued a press release (read by plaintiff on or about October 21, 2019)
that it had secured financing of $1.7 billion, subject to certain terms, that the
company would use to finance working capital and support the issuance of
required performance guarantees on new projects. The tone and tenor of the press
release was that the company's liquidity problems had been solved. Nowhere in
the press release was the possibility of bankruptcy even raised, even though the
company had decided in mid-September to declare bankruptcy. The press release
included a statement from defendant Dickson, McDermott President and CEO,
that:

"This new credit agreement is a continued signal from our lenders that they
support McDermott, our underlying business growth strategy and ability to achieve
a long-term balance sheet solution. The Agreement provides near-term liquidity
for the Company to manage working capital and provide performance guarantees
on expected new awards. We remain focused on serving our customers' needs,
supporting our dedicated employees and maintaining our valued relationships with
our subcontractors, suppliers and other business counterparties, all as part of our
efforts to enhance our position as a premier, fully integrated provider to
technology, engineering and construction solutions to the energy industry."

47. The press release reiterated McDermott's plan to sell Lummus
Technology: "McDermott continues to pursue the previously announced strategic
alternatives process for Lummus Technology".

48. The press release also announced that McDermott had withdrawn its
previously stated guidance for full-year 2019. The defendants, acting in concert
and in furtherance of the scheme or through negligence, gave no new guidance for

full-year 2019 earnings. Nowhere in the press release, written by the defendants, acting in concert and in furtherance of the scheme or through negligence, were the highly material facts that McDermott had already decided to declare bankruptcy or that it was going to report massive losses for the remainder of the year and for full-year 2019.

49. On October 22, 2019, just one day after the October 21, 2019, press release, McDermott and AP Services, an affiliate of AlixPartners, entered into an agreement (the "October 22 Agreement") that replaced a September 17, 2019, agreement between McDermott and AlixPartners, wherein AP Services agreed "to provide temporary personnel to McDermott to assist in a contemplated financial restructuring." Bankr. Proc. ECF No. 916 at 1 (¶1). Among other things, **the October 22 Agreement provided for the payment of a $5 million success fee that would be earned upon the completion of a restructuring through confirmation of a Chapter 11 plan of reorganization.** Bankr. Proc. ECF 434-1.

50. Even though the October 22 Agreement was highly material, the defendants, in concert and in furtherance of the scheme or through negligence, did not report it to plaintiff or the investing public in order to keep McDermott's share price at an artificially high level.

51. **Just two weeks after the October 21, 2019, press release, November 4, 2019, McDermott released its third quarter results in which it reported a net loss of $1.887 billion, or $10.37 per share.**

52. Prior to the third quarter report, the defendants, acting in concert and in furtherance of the scheme or through negligence, had not made any announcement to plaintiff or the investing public that the third quarter results were going to substantially deviate from what had been projected. As noted herein, on October 21, 2019, defendants, acting in concert and in furtherance of the scheme or through negligence, issued a press release (read by plaintiff on or about October 21, 2019) which, among other things, withdrew the company's full-year, 2019, guidance without updating said guidance even though the defendants, acting in concert and in furtherance of the scheme or through negligence, had forecast a "sharp improvement" for the fourth quarter just weeks earlier.

53. On the same day, November 4, 2019, McDermott filed its Form 10-Q (for the third quarter, 2019) in which it disclosed for the first time that it was being investigated by the SEC. Plaintiff read the 10-Q on or about November 5, 2019. Significantly, McDermott was notified by the SEC in July 2019 (by a letter dated July 26, 2019 together with an accompanying subpoena) that it was conducting an investigation related to disclosures made by the company concerning the reporting of projected losses associated with the Cameron LNG project.

54. At no prior time did the defendants or the company disclose to the plaintiff or the investing public the existence of the SEC's investigation. The defendants, acting in concert an in furtherance of the scheme or through negligence, kept the plaintiff and the investing public in the dark about the material SEC investigation for over three months, from July 26, 2019, to November 4, 2019.

55. The November 4, 2019, 10-Q for the first time described a Chapter 11 filing as a risk McDermott *might* face. This statement was materially false and misleading when made because, as described above, the defendants, McDermott, and their advisors had already begun preparing a Chapter 11 bankruptcy plan starting in late September, 2019. In other words, there was no *might* at all. There was a *will*. A McDermott Chapter 11 filing was certain, not just possible.

56. On November 4, 2019, the day of the third quarter earnings announcement, McDermott reported that defendant Stuart Spence, the company's Chief Financial Officer whose compensation was $3.6 million in 2018 (largely the result of stock grants) had resigned "to pursue other opportunities". Mr. Spence's resignation date was actually November 4, 2019, the date of the disastrous third quarter earnings announcement. As discussed above, defendant Spence was already the defendant in litigation against him, defendant Dickson and McDermott

which, among other things, accused him of making false and misleading statements relating to McDermott's finances.

57.  Defendant Spence also received a severance payment of $866,000.00 and other benefits from McDermott in return for his release of all claims against McDermott and its employees and agents, **including any such matter arising from the negligence, gross negligence or reckless, willful or wanton misconduct of any of the Releasees**.

58.  The release does not include any claims for indemnification for suits filed against Defendant Spence by outside parties during his tenure at McDermott.

59.  The release has a non-disparagement agreement:

"Employee shall refrain from making, directly or indirectly, in any public or private communication (whether oral, written or electronic), any criticisms or negative or disparaging comments or other statements about the Company or any of the other Releasees, or about any aspect of the respective businesses, operations, financial results or prospects of any of the Company Entities, including comments relating to Employee's termination of employment. Notwithstanding the foregoing, it is understood and agreed that nothing in this Section 4(b) or in Section 5 hereof is intended to: (i) prevent Employee from testifying truthfully in any legal proceeding brought by any governmental authority or other third party or interfere with any obligation Employee may have to cooperate with or provide information to any government agency or commission, subject to compliance with the provisions of Section 5(c) hereof, if applicable; (ii) prevent Employee from advising Employee's spouse of the terms and conditions of this Agreement; or (iii) prevent Employee from consulting with Employee's own legal counsel, as contemplated by Section 7 of this Agreement."

60. Most importantly, the release has a non-disclosure agreement

prohibiting defendant Spence from disclosing any information to McDermott

analysts or shareholders:

" *Employee will not disclose any of the Confidential Information to any securities analysts, shareholders, prospective investors*, customers, competitors or any other third party, including any third party who has or may express an interest in acquiring any of the Company Entities or all or any significant portion of their respective outstanding equity securities or assets. If Employee is legally required to disclose any Confidential Information, Employee shall, to the extent not prohibited by applicable law or legal process, promptly notify the Company in writing of such requirement so that the Company or any of the other Company Entities may seek an appropriate protective order or other relief or waive compliance with the nondisclosure provisions of this Section 5 with respect to such Confidential Information. To the extent not prohibited by applicable law, Employee agrees to cooperate with and not to oppose any effort by the Company or any other Company Entity to resist or narrow such request or to seek a protective order or other appropriate remedy. In any such case, Employee will: (i) disclose only that portion of the Confidential Information that, according to written advice of Employee's counsel, is required to be disclosed; (ii) use reasonable best efforts to obtain assurances that such Confidential Information will be treated confidentially; and (iii) to the extent not prohibited by applicable law, promptly notify the Company in writing of the items of Confidential Information so disclosed."

61. Defendant Spence may have to pay back McDermott for any payments

made to him if he breaches the agreement or even if a court or arbitrator finds it

invalid or unenforceable:

"Employee agrees that in the event that (i) Employee breaches any term of Sections 3 or 4 hereof or this Section 5, or (ii) Employee challenges the validity of all or any part of this Section 5, and all or any part of this Section 5 is found invalid or unenforceable for any reason whatsoever by a court of competent jurisdiction or an arbitrator in a proceeding between Employee and a Company Entity, in addition to any other remedies at law or in equity the Company may have available to it, the Company shall not be obligated to make any of the payments and may cease to make such payments or to provide for any of the benefits specified in Section 2

hereof, and shall be entitled to recoup from Employee any and all of the value of the payments and benefits provided pursuant to Section 2 hereof that have vested or been paid pursuant to that Section."

62.  It can be inferred from the above that McDermott did not want the details of its financial operations and outlook to become public and that defendant Spence may have known something that McDermott was paying him not to discuss.

63.  On December 2, 2019, the defendants, acting in concert and in furtherance of the scheme or through negligence, wrote and issued a press release titled *McDermott to Access $350 Million Tranche B Financing Under Superpriority Senior Secured Credit Facility.*  The press release stated that McDermott was granted access to the second tranche of funding (Tranche B) under the superpriority senior secured credit agreement (SSSCA), whereby the company received a $250 million Term Loan Facility and a $100 million Letter of Credit Facility.  The press release, read by plaintiff on or about December 2, 2019, stated that McDermott would use the proceeds "to continue financing working capital and support the issuance of required performance guarantees on new projects."  In the press release, the defendants also reiterated the company's continued pursuit of "the previously announced strategic alternatives process for Lummus ...." Id.

64.  The December 2, 2019, press release, however, was materially false and misleading when made because, as the following declaration of John Castellano to

the bankruptcy court shows, it failed to disclose the material fact that the

company's secured lenders would not provide any further liquidity under the

SSSCA to fund business operations, and that the sale of Lummus would be

consummated only as part of a Chapter 11 process:

"On December 1, 2019, after significant deliberation and discussion with the
secured lenders on whether to fund the second tranche under a debtor-in-
possession financing facility rather than on an out-of-court basis, McDermott
gained access to the second tranche of funding under the Superpriority Facility
providing an incremental $250 million term loan facility ($229 million after fees)
and a $100 million letter of credit facility. ***In connection with this funding, the
secured lenders stated that they did not expect to fund any additional amounts on
an out-of-court basis. As such, McDermott's liquidity would drive the timing of
any potential chapter 11 filing.***

***McDermott told prospective purchasers of [Lummus] that the purchase was to be
consummated as part of a chapter 11 process, and provided clear milestones for
the marketing process with the aim of achieving a signed "stalking horse"
purchaser by the time McDermott would need to seek chapter 11 relief.***"
Castellano Decl.

Mr. Castellano subsequently stated to the bankruptcy court:

"McDermott enters chapter 11 with a massively consensual prepackaged
restructuring."  "Getting here has been an all-out sprint for the company and its
many stakeholders around the globe."  ***"Since September 2019, McDermott has....
marketed and achieved a signed stalking-horse purchaser for the sale of
[Lummus]"***.  Castellano Decl.

65.  Between November 8, 2019, and December 26, 2019, plaintiff

purchased an additional 8,000 shares of McDermott International shares at a total

cost of $7219.  Had the defendants disclosed the material information that the

company was going to continue experiencing massive losses at its Cameron and

Freeport facilities, that the company was in dire need of working capital, that it had or was about to violate its loan covenants, that the company was actively pursuing and finalizing a bankruptcy filing and had the defendants not intentionally materially overstated the company's projected results (see above), plaintiff would not have purchased or held the stock.

66.  McDermott did not release fourth quarter 2019 results.  However, McDermott advisors Evercore, Kirkland & Ellis and AlixPartners estimated that McDermott experienced a fourth quarter operating loss of $141 million, or approximately $.77 per share, even though the defendants had been saying as late as July 29, 2019, (second quarter 2019 earnings release) that operating income was going to achieve a "**sharp improvement**" during the fourth quarter of 2019.

67.  On January 21, 2020, McDermott formerly announced that it was filing a Prepackaged Chapter 11 proceeding in the United States Bankruptcy Court for the Southern District of Texas (Case number 20-30336).  As part of the filing, the company announced that it was proposing that all of the existing outstanding shares of McDermott would be cancelled (declared worthless).

68.  Prior to the January 21, 2020, announcement, the defendants, acting in concert and in furtherance of the scheme or through negligence, had made no announcements to plaintiff or the investing public that the company was even considering bankruptcy or that it had decided to declare bankruptcy in mid-

September, 2019.  Throughout the entirety of 2019 and up until the January 21, 2020, bankruptcy announcement, the defendants, acting in concert and in furtherance of the scheme or through negligence, produced and published a continuous stream of positive press releases, read by plaintiff, touting the continued and unparalleled success of the company and its operations.  **Not one press release informed plaintiff or the investing public of the present or future difficulties the company was experiencing or of the company's decision to declare bankruptcy in mid-September, 2019.  Indeed, to the contrary, at all times relevant, McDermott continually inundated plaintiff and the investing public with nothing but feel-good, good news press releases falsely touting the company's results, financial condition and outlook.**  These press releases can be found here:

https://www.mcdermott-investors.com/news/default.aspx

69.  Just prior to the January 21, 2020, bankruptcy announcement, McDermott shares were trading at $.70 per share.  After the January 21, 2020, announcement, McDermott's share price fell to a low of $.01 per share.  The shares have since been cancelled and are now worthless.

70.  Part of McDermott's bankruptcy Plan filed with the court called for the issuance of new common stock.  The Management Incentive Plan included in the company's bankruptcy Plan calls for the reservation of 7.5% of the new stock to be

used in grants to McDermott management and the company's Board of Directors.
Assuming the number of pre-bankruptcy shares outstanding (193 million), a
conservative post-bankruptcy share price of $25 and 10% of the post-bankruptcy
7.5% insider share allotment goes to defendant Dickson, defendant Dixon stands to
gain over $36,000,000 from a McDermott bankruptcy (193,000,000 x $25 x .10 x
.075 = $36,187,000), not including his annual salary.

## DEFENDANTS' DUTY TO DISCLOSE

71.  Plaintiff alleges that he was directly harmed by the actions of the
defendants as described herein.  (Plaintiff also alleges that the actions of the
defendants as described herein did not deplete the assets of the bankruptcy estate.)
The defendants had a duty to disclose material facts and omissions to the plaintiff
because:

A.  The defendants, especially defendants Dickson and Spencer, had a
special fiduciary relationship with the plaintiff.  (See esp. paragraph 83 below.)

B.  The defendants voluntarily disclosed partial information to the plaintiff,
but knowingly failed to disclose the whole truth, as seen herein.

C.  The defendants made representations to plaintiff but knowingly failed to
disclose new information that made the earlier representations misleading or
untrue, as seen herein.

D. The defendants made partial disclosures to plaintiff which conveyed a false impression, as seen herein.

## SCIENTER ALLEGATIONS

(NOTE: As noted above, this is a state law cause of action that was filed in state court but removed to Federal Court by the defendants. This Plaintiff's Second Amended Petition is also a state law cause of action which has been filed in response to the (Federal Bankruptcy) Court's instruction on March 10, 2021, to file an amended petition containing only state law claims as preparatory to having this case remanded to state court. Although a plaintiff is not required to plead Scienter in a state law cause of action, plaintiff has done so herein in an abundance of caution.)

72. As alleged herein, defendants acted with scienter because they knew that the public documents and statements they issued and/or disseminated in the name of McDermott were materially false and/or misleading or failed to disclose (omitted) material facts to make them not misleading and they knew that such documents or statements would be issued or disseminated to the plaintiff and the investing public. The defendants participated in the scheme to fool plaintiff and the investing public into continuing to purchase and hold McDermott International shares by making material misrepresentations and omissions so that the defendants

would benefit by having their own holdings of McDermott International shares remain at inflated levels they would not have been at had the material misrepresentations and omissions not been made.

73. Defendants, as the individuals that created, signed, were quoted in, or orally made the allegedly false and misleading statements described herein were obligated to familiarize themselves with the subject matter of those public statements and to speak truthfully. The defendants violated such obligations.

74. Defendants, as the individuals that certified filings made to the SEC filing pursuant to Exchange Act Rules 13a-14(a)/15d-14(a) and Section 906 of the Sarbanes-Oxley Act of 2002, were obligated to inquire and investigate, familiarize themselves with the subject matter underlying their certifications, and reassure themselves that the matters they were certifying were accurate and that McDermott was speaking truthfully when it made such disclosures.  The defendants violated such obligations.

75. The statements of defendants and their agents evidencing that there was never a plan for the out-of-court sale of Lummus to strengthen McDermott's balance sheet demonstrate strong evidence of conscious misbehavior or recklessness.  Motive and opportunity are also evident.

76. As detailed above, defendants had significant personal financial motivations, unique to them, to engage in the misconduct alleged herein.

77. Defendants were motivated by their compensation packages, retention bonuses, and continued employment and took affirmative actions to protect their financial interests including when they denied that a bankruptcy was forthcoming even after the company had already decided to pursue Chapter 11.

78. Defendants' scienter was further demonstrated when they, in concert and in furtherance of the scheme or through negligence, gave clear guidance that the proposed Lummus sale process was proceeding when, in fact, defendants and their advisers had previously concluded that there was no way of avoiding bankruptcy and Lummus would be sold only as part of a bankruptcy.

79. In addition, as seen herein, the Management Incentive Plan in the Plan of Reorganization leaves management with a significant equity stake even as common stockholders' interests are eliminated.

80. The company's public filings with the SEC that attempt to conceal or otherwise obfuscate defendants' fraudulent conduct are also highly probative of scienter. For example, defendants' repeated assertions that the (out-of-court) sale process for Lummus was ongoing is highly probative of scienter; as are defendants' dismissals of the prospect of a Chapter 11 filing as rumor or speculation.

81. Even further, the fraud alleged herein implicates the core operations of McDermott, since its acute liquidity crisis threatened the company's very existence

as an ongoing concern. In light of these facts and their day-to-day involvement in the development of a prepackaged Chapter 11 Plan of Reorganization, it is inconceivable that defendants did not have actual access to information contradicting the statements made in the company's name regarding the sale process for Lummus and the prospect of bankruptcy. Such knowledge is imputable to defendants given the implication of core operations and the defendants' roles and status within the company.

82. Defendants' flagrant violation of express corporate policy further buttresses the inference of defendants' scienter, whether based on their knowledge or their recklessness.

83. McDermott's Code of Ethics for Chief Executive Officer and Senior Financial Officers (the "Code"), applies to both defendants Dickson and Spencer. The Code is available at

http://s22.q4cdn.com/787409078/files/doc_downloads/governance_documents/CG-Code-of-Ethics-for-CEO-SFOs.pdf

Pursuant to the Code:

**"Full and fair disclosure.** It is the Company's policy that the information in its public communications, including filings with the Securities and Exchange Commission, be timely and understandable and fair, complete and accurate in all material respects. Covered Employees should exercise diligence and care to do their part in acting in furtherance of this policy. ***Covered Employees are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the Company to anyone having a role in the Company's financial reporting and disclosure processes.*** Covered Employees must not directly or indirectly take any action to coerce, manipulate, mislead or

fraudulently influence the Company's or its subsidiaries' independent auditors or any internal accounting or auditing personnel for the purpose or with the effect of rendering the Company's financial statements misleading, or direct anyone else to do so.

It is the responsibility of each Covered Employee promptly to bring to the attention of the Company's Disclosure Committee any material information of which the executive may become aware that affects the disclosures made by the Company in its public filings or otherwise, and otherwise to assist the Disclosure Committee in fulfilling its responsibilities. In addition, ***each Covered Employee shall promptly bring to the attention of the Disclosure Committee any information the employee may have concerning*** (a) significant deficiencies or material weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial information or (b) ***any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls***.

...

**Reporting of violations of this code.** ***Each Covered Employee is responsible for reporting any violation of this Code of Ethics, or circumstances which the Covered Employee considers to involve a probable violation, to the Compliance Officer identified below.*** Employees may choose to remain anonymous in reporting violations or circumstances that may involve a violation.

**Accountability.** ***Each Covered Employee will be held accountable for his or her adherence to this Code of Ethics.*** The failure to observe the terms of this Code of Ethics may result in disciplinary action, up to and including termination of employment. ***Violations of this Code of Ethics may also constitute violations of law that may result in civil and criminal penalties.***"

84. As seen herein, defendant Spencer's non-disclosure agreement, made by him upon his separation from the company in exchange for a payment of $866,000.00, included a promise not to disclose any information "to any securities analysts, shareholders, prospective investors, .......". This, as well as the other promises he made in his termination agreement, is highly indicative of scienter.

## COUNT 1
## COMMON LAW FRAUD

85.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86.  The defendants made or caused to be made material representations to the plaintiff about McDermott International, its performance and its financial condition which were false, inaccurate or misleading.

87.  When the defendants made the representations to the plaintiff, they knew the representations were false or they made the representations recklessly, as positive assertions, and without knowledge of their truth.

88.  The defendants made the representations with the intent that the plaintiff would act on them.

89.  The plaintiff acted on the representations.

90.  The defendants agreed upon and operated a scheme ("the scheme") to artificially inflate McDermott's share price by not disclosing the company's financial condition and outlook, including, but not limited to, material current and projected losses from the Cameron and Freeport projects and elsewhere and the company's impending bankruptcy, to plaintiff.  The defendants participated in the scheme to fool plaintiff into continuing to purchase and hold McDermott International shares by making material misrepresentations and omissions so that the defendants would benefit by having their own holdings of McDermott

International shares remain at inflated levels they would not have been at had the material misrepresentations and omissions not been made.

91.  The defendants failed to disclose the material facts necessary to make the statements they and their representatives made, in light of the circumstances under which they were made, not misleading.

92.  The defendants did not have a reasonable basis for their alleged false statements and omissions and engaged in practices and a course of business that operated as a fraud and deceit upon plaintiff.

93.  The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct (the scheme) to conceal adverse material information about McDermott International, including, but not limited to, its actual (poor) present financial condition, its projected large earnings losses and its impending bankruptcy filing.

94.  The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal the fact that the company, including its Cameron LNG and Freeport LNG operations, were experiencing and were projected to experience large losses.

95. The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal the fact that the company was contemplating bankruptcy, that a bankruptcy filing was imminent and that the company had made the decision to file for bankruptcy.

96. Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the true status of McDermott's financial condition and outlook in order to maintain McDermott's share price at an artificially high, inflated, level it would not have been at had the material misrepresentations and omissions not been made.

97. The defendants and their representatives, with prior knowledge and approval of the defendants, made the misrepresentations and omissions of material facts set forth herein with the intent to induce the plaintiff to rely on such misrepresentations and omissions of material fact.

98. Plaintiff reasonably relied on the defendants' misrepresentations and omissions of material facts in connection with his purchases and retention of McDermott International common stock. Plaintiff relied on these statements both directly to the extent they were personally made to plaintiff and indirectly to the extent they artificially inflated the market price. But for the defendants'

representations (wrongful conduct), plaintiff would not have purchased and retained (held) his McDermott International stock.

99.  Plaintiff alleges that he was directly harmed by the actions of the defendants as described herein.  Plaintiff further alleges that the actions of the defendants as described herein did not deplete the assets of the bankruptcy estate.

100.  As a direct and proximate result of defendants' representations (wrongful conduct), plaintiff suffered damages in connection with his purchases and his retention (holding) of McDermott International common stock in excess of the jurisdictional limits of this Court.

101.  Pursuant to Section 41.003 of the Texas Civil Practice and Remedies Code, plaintiff is entitled to recover exemplary damages in an amount to be determined by the trier of fact.

## DISCOVERY RULE AND FRAUDULENT CONCEALMENT

102.  Plaintiff asserts all applicable state statutory, common law and contractual rights and theories related to the tolling and/or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule, and/or fraudulent concealment.

## JURY DEMAND

103. Plaintiff demands a trial by jury on all issues so triable.


## PRAYER

WHEREFORE, Plaintiff prays that defendants be cited to appear herein and, after a trial on the merits, that the Court enter judgment awarding plaintiff the following:

1. actual damages;

2. exemplary damages;

3. costs;

4. pre-judgment and post-judgment interest as allowed by law; and

5. all such other and further relief, both general and special, at equity and at law, to which plaintiff may be justly entitled.


Respectfully submitted,


/s/ Michael Van Deelen
Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com
Plaintiff

This page intentionally left blank.